# JOHN ELSON

ATTORNEY AT LAW
1840 41st Ave.
#102-176
Capitola, CA  95010-2527
831-475-8535 voice
831-475-8532 fax
j_h_elson@yahoo.com

November 5, 2010

Magistrate Judge Joseph C. Spero
United States District Court
450 Golden Gate Avenue
Courtroom A, Fifth Floor
San Francisco, CA 94102-3611

       Re:    *Doubt v. NCR*
           *Case #* C09-05917 SBA

Dear Judge Spero:

This is an action by a long-time former employee of NCR alleging wrongful discharge in violation of fundamental public policy and age discrimination, and breach of implied contract to terminate only for good cause.  Plaintiff sued in Alameda Superior Court and defendant removed to federal court based upon diversity of citizenship.

The first amended complaint alleges the facts in some detail; defendant's answer admits some allegations concerning the nature of NCR's business and how organized, but denies virtually all allegations concerning an unlawful motive for firing plaintiff, and asserts affirmative defenses.

In short, plaintiff was a customer engineer ("CE") who performed the maintenance and repair of mechanical point of sale devices for NCR's customers.  On April 30, 2008 defendant placed plaintiff on a "performance improvement plan" ("PIP") based upon plaintiff having poor "SLAs", which NCR contends are statistical measures of employee productivity.  On September 16, 2008, defendant fired plaintiff for allegedly unsatisfactory performance, in particular for failing to improve his SLAs.

Plaintiff contends, *inter alia*, the reason given for his termination was pretextual and that the real reason was NCR's desire to cut costs by firing higher earning older CEs and get rid of those employees who NCR realized it would have to pay a significant settlement in a class-action alleging failure to pay overtime that NCR learned of several months before firing plaintiff.

Defendant denies all of plaintiff's allegations and contentions.

1

## TABLE OF CONTENTS

**STATEMENT OF ISSUES** ...................................................................4

1.      <u>Plaintiff's FRCP Rule 34 request for the production of documents.</u> ...................................4

        A.    <u>The remaining document production categories in dispute.</u> ......................11

        B.    <u>When defendant will produce the documents not subject to dispute.</u>.........48


**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ARGUMENTS TO COMPEL DISCOVERY** ..........................................49

    I
    **PLAINTIFF'S CONTENTIONS CONCERNING HIS CLAIMS FOR**
    **RELIEF AND SUPPORTING AUTHORITY**.............................................................49

            A.    <u>Disparate impact / Direct proof of discriminatory motive.</u> ............49

            B.    <u>Disparate treatment.</u>.........................................................50

            C.    <u>Retaliatory discharge.</u> .....................................................53

            D.    <u>Punitive damages.</u>............................................................53

    II
    **PLAINTIFF'S CONTENTIONS AS TO WHAT THE**
    **EVIDENCE ALREADY IN HAND SHOWS** ..........................................................54

            A.    <u>NCR's short staffing, hostility to overtime and cost-cutting in 2008.</u>54

            B.    <u>Plaintiff's performance.</u>...................................................55

            C.    <u>Management's use of PIP write-ups as a pretext for firing.</u>............56

            D.    <u>Events in 2008.</u> ..............................................................57

            E.    <u>Despite evidence of widespread failure of CEs to meet SLAs in
            2008, according to NCR's own paperwork only those over 50, including
            plaintiff, were fired.</u> ......................................................59

    III
    **WHAT PLAINTIFF'S DISCOVERY SOUGHT** .......................................................59

2

IV
**NCR'S OBJECTIONS ARE SANCTIONABLE**................................................................61


**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF ARGUMENTS TO LIMIT DISCOVERY**.................................................63


2.    Plaintiff's efforts to schedule depositions of (a) NCR's "person most
      knowledgeable ("PMK") under Rule 30(b)(6), and (b) percipient
      witnesses, and the locations of those depositions. ................................65


3.    Plaintiff's FRCP Rule 36 requests for admissions..........................................66

4.    Plaintiff's request that he be allowed to take more than ten depositions...........................67


      INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFF'S CONTENTIONS
       AS TO WHAT THE  EVIDENCE ALREADY IN HAND SHOWS .........................................70

## STATEMENT OF ISSUES

These are the issues which currently require the Court's attention:

1.    Plaintiff's FRCP Rule 34 request for the production of documents;

2.    Plaintiff's efforts to schedule depositions of (a) NCR's "person most knowledgeable ("PMK") under Rule 30(b)(6), and (b) percipient witnesses, and the locations of those depositions;

3.    Plaintiff's FRCP Rule 36 requests for admissions; and

4.    Plaintiff's request that he be allowed to take more than ten depositions.

1.    <u>Plaintiff's FRCP Rule 34 request for the production of documents</u>.

On July 2nd plaintiff propounded a request for documents under FRCP Rule 34. On August 2nd NCR served its written responses, refusing to produce any documents based upon various objections, which included the pendency of NCR's motion to compel arbitration[1].

In response to NCR's objections, on September 7, 2010 plaintiff's counsel emailed to then lead defense counsel John Cowden of Jackson Lewis

(1)    a 15 page single-spaced letter explaining the claims being made by plaintiff, the applicable law governing those claims, what the evidence already in hand (based upon the documents produced by both parties as part of their initial Rule 26 disclosures) showed, what the request for documents sought in light of plaintiff's claims, and why NCR's objections were not merely specious but sanctionable, and

(2)    a 165 page double-spaced statement of the text of each category in the request, NCR's objections, and why the documents in the category were relevant to the claims or defenses.

On October 7th counsel for the parties met in person. Defense counsel agreed to produce documents responsive to most categories, leaving a relatively few categories the subject of dispute:

*To confirm, the requests for production on which we still need to meet and confer include Request Nos. 6, 8, 9, 35-38, 89-91, 128-134, 137-142, 147, and 148*

---

[1]  By order dated September 13, 2010, docket item #37, Judge Armstrong denied NCR's motion to compel arbitration.

4

October 8, 2010 11:35 AM email from Christine Young to John Elson.

Plaintiff's counsel responded shortly thereafter:

*my notes reflect*

*6 & 7:  Pat would check w/ NCR.*

*8 & 9:  Harvey lost HD, but you would look to see if emails available on the server(s).*

*35 - 38:  all ok, NCR will produce w/o objection, but may redact to protect amounts of bonuses paid to specific individuals.*

*89 & 90:  objection stands, but will have counter-proposal for narrower scope of docs to be produced.*

*128 - 134:  objection stands, but will have counter-proposal for narrower scope of docs to be produced.*

*137 - 142:  objection stands, but will have counter-proposal for narrower scope of docs to be produced.*

*147 & 148:  objection stands, but will have counter-proposal for narrower scope of docs to be produced.*

*I think the only difference between us may be 91, which concerned docs re:  staffing level of Monterey workgroup, i.e., how many bodies would be normal complement of team covering Santa Cruz, Monterey & San Benito counties.  I can't see how that is objectionable, and my recollection is Pat agreed..*

*One thing we didn't discuss was when the docs as to which there was agreement to produce w/o objection would be turned over.  The request was propounded in early July, so production by 10/31 is hardly unreasonable.  Can you share your thoughts?*

October 8, 2010 12:01 PM email from John Elson to Patrick Mullin & Christine Young.

Specifically, Defendant has agreed to produce the following categories of documents by December 6, 2010, to the extent they exist and may be located:

> 1. Any tables or charts similar to that produced by NCR as NCRPROD00197 showing the names, ages, and hire dates of customer engineers who were terminated in 2008 or 2009, including the reasons

for their termination, to the extent such tables or charts exist (this category encompasses Request for Production ("RFP") No. 1);

2.  Any documents reflecting customer comments about Plaintiff in 2007 and 2008, to the extent such documents exist (this category encompasses RFP Nos. 2, 3);

3.  Any documents showing the training NCR offered Plaintiff in 2007 and 2008, to the extent such documents exist (this category encompasses RFP Nos. 4, 5);

4.  All performance evaluations for Plaintiff in 2003, 2004, and 2005, to the extent they exist (this category encompasses RFP Nos. 10, 12, 14);

5.  All documents reflecting internal NCR comments regarding Plaintiff's comments about his performance reviews for the years 2003, 2004, 2005, 2006, and 2007, to the extent such documents exist (this category encompasses RFP Nos. 11, 13, 15, 16, 17);

6.  All policy statements, guidelines, instructions, or correspondence to NCR managers on how to evaluate Customer Engineers from 2003-2008, including whether to have a Customer Engineer sign his evaluation or whether to retain copies of Customer Engineer performance evaluations (this category encompasses RFP Nos. 18, 19, 20, 21, 22, 23);

7.  All documents reflecting, explaining, or commenting on the absence of Plaintiff's performance evaluations for 2003, 2004, and 2005 in Plaintiff's personnel file, to the extent such documents exist and are non-privileged (this category encompasses RFP Nos. 24, 25, 26);

8.  All documents reflecting, explaining, or commenting on any comments Plaintiff made on his 2008 performance review, to the extent such documents exist and are non-privileged (this category encompasses RFP No. 27);

9.  All policy statements, guidelines, instructions, or correspondence to NCR managers from 2003-2008 regarding the reasons for awarding "points" (non-cash compensation) to Customer Engineers, to the extent such documents exist (this category encompasses RFP Nos. 28, 29);

10. All documents advising Plaintiff he had been awarded "points," to the extent such documents exist (this category encompasses RFP No. 30);

6

11. All documents reflecting the total number of "points" Plaintiff received during his employment at NCR, to the extent such documents exist and Defendant is not required to create a compilation (this category encompasses RFP No. 31);

12. All policy statements, guidelines, instructions, or correspondence to NCR managers from 2007-2008 regarding NCR's 'pay for performance philosophy,' as mentioned in the 05/29/07 e-mail to Plaintiff from NCR's Global Compensation, to the extent such documents exist (this category encompasses RFP Nos. 32, 33);

13. All documents explaining how Plaintiff's 2007 bonus of $1,985.50 was calculated, to the extent such documents exist and are non-privileged (this category encompasses RFP No. 34);

14. All documents explaining the changes in NCR's Business Performance Plan referred to in Chris Cheadle's 07/03/2007 e-mail, to the extent such documents exist (this category encompasses RFP No. 39);

15. All policy statements, guidelines, instructions, or correspondence to NCR managers regarding the criteria for placing Customer Engineers on performance improvement plans ("PIPs") in 2007-2008, including whether Customer Engineers should sign PIP memos or whether copies of PIP memos should be retained, the to the extent such documents exist (this category encompasses RFP Nos. 40-45);

16. All policy statements, guidelines, instructions, or correspondence to NCR managers regarding monitoring the progress of Customer Engineers who were placed on PIPs in 2007 and 2008, to the extent such documents exist (this category encompasses RFP Nos. 46, 47);

17. All policy statements, guidelines, instructions, or correspondence to NCR managers regarding whether NCR should retain a Customer Engineer rather than terminating him, if the Customer Engineer was progressing favorably during the PIP period, to the extent such documents exist (this category encompasses RFP Nos. 48, 49);

18. All policy statements, guidelines, instructions, or correspondence to NCR managers from 2007-2008 regarding PIP "light" or "lite" and whether certain Customer Engineers should be placed on PIP "light" or "lite," to the extent such documents exist (this category encompasses RFP Nos. 50-54);

19. The job description for Customer Engineer 3 at the time the position was eliminated (this category encompasses RFP No. 55);

7

20. The job description for Customer Engineer 2 at the time the position was given to Plaintiff (this category encompasses RFP No. 56);

21. All official versions of the job descriptions for Customer Engineer 1 and Customer Engineer 2 during calendar years 2007 and 2008 (this category encompasses RFP Nos. 57-60;

22. All "D1 Data" entries reflecting Michael Mopia handling work orders in the area assigned to Plaintiff's workgroup in 2008, to the extent such documents exist (this category encompasses RFP No. 61);

23. All "OGI Reports" submitted by Michael Mopia during calendar year 2008 concerning work orders he handled in the area assigned to Plaintiff's workgroup in 2008, to the extent such documents exist (this category encompasses RFP No. 62);

24. All spreadsheets submitted by Michael Mopia during calendar year 2008 to any territory manager concerning work orders he handled in the area assigned to Plaintiff's workgroup in 2008, to the extent such documents exist (this category encompasses RFP No. 63);

25. All electronically stored information regarding assignments by NCR's Control Tower via RIM device to Michael Mopia to work orders he handled in the area assigned to Plaintiff's workgroup in 2008 including Mopia's responses to NCR's Control Tower via RIM device regarding the same, to the extent such documents exist (this category encompasses RFP Nos. 64-65);

26. Documents that define or explain the terms "ATM, Retail, Networking, Proof, Break Fix Assistance, First Line, On Site Proof Centers, Financial, Fast Lane" as these terms appear on Erick Aguilar's 2008 scheduling spreadsheets, to the extent such documents exist (this category encompasses RFP No. 66);

27. Documents that define the criteria for measuring SLA Response, SLA Restoral, First Visit Resolution, and Closed Calls Per Day, as these terms were used on Plaintiff's 2008 PIP, to the extent such documents exist (this category encompasses RFP Nos. 67-70);

28. Every warning letter or PIP prepared in 2007 or 2008 concerning Mark Paulley, Dante Banez, Cezar Guerrero, Alex Vasser, Hieu Nguyen, Gilbert Latorre, James Schlaman, Ernesto Mendoza, and Kenny Chang, whether signed or unsigned, and to the extent such documents exist (this category encompasses RFP Nos. 71-88);

8

29. Documents showing how many people worked in Plaintiff's workgroup (the Monterey group) in 2008, to the extent such documents exist (this category encompasses RFP No. 91);

30. Any documents reflecting any "extra work" performed by Plaintiff in 2008 or the "difficult times," referred to in Erick Aguilar's 08/20/08 e-mail to Plaintiff, to the extent such documents exist (this category encompasses RFP Nos. 92, 93);

31. All official job descriptions for Territory Manager,  Assistant Operations Director, Operations Director,  and Human Resources Manager in 2008, to the extent such documents exist (this category encompasses RFP Nos. 94-97);

32. All official job descriptions for the positions held by Brenda Michalek, Joe Hoyle, John Foote, Chris Cheadle, Chris Wallace, and Steve Battleson in 2008, to the extent such documents exist (this category encompasses RFP No. 98-103);

33. Each organizational chart in effect in 2008 that includes Plaintiff or Erick Aguilar or John Harvey or John Foote or Bruce Schagunn or Brenda Michalek or Vicki Rennick or Joe Hoyle or Chris Cheadle or Chris Wallace or Steve Battleson, to the extent such charts exist (this category encompasses RFP Nos. 104-114);

34. All official versions of any maps or charts reflecting NCR's demarcations in 2008 of the West, Central, Northeast, Southeast areas of the U.S. or NCR's subareas in the U.S. or NCR's territories in the U.S., to the extent such documents exist (this category encompasses RFP Nos. 115-118);

35. All official versions of any maps or charts reflecting the locations of NCR's customers in Erick Aguilar's territory in 2008, to the extent such documents exist (this category encompasses RFP No. 119);

36. All policy statements, guidelines, instructions, or correspondence to NCR managers in 2007 or 2008 regarding using NCR's more senior Customer Engineers for "lower end repair work" as stated in the 07/06/2001 Dave Henderson e-mail, to the extent such documents exist (this category encompasses RFP Nos. 122-123);

37. All policy statements, guidelines, instructions, or correspondence to NCR managers from 2007-2008 regarding monitoring Customer

Engineers' overtime generally, to the extent such documents exist (this category encompasses RFP Nos. 124-125);

38. All documents in 2007-2008 regarding monitoring the overtime worked by Customer Engineers supervised by Erick Aguilar, to the extent such documents exist (this category encompasses RFP No. 126);

39. All documents that prompted the 09/10/2008 e-mail from John Harvey regarding "Important: NW Overtime Approval Process effective immediately," to the extent such documents exist (this category encompasses RFP No. 127);

40. All documents reflecting the "pressure to exit the double NIs" as referred to in the 05/01/2008 e-mail from Brenda Michalek, to the extent such documents exist (this category encompasses RFP No. 135);

41. All documents reflecting the "marching orders" as referred to in the 04/29/2008 e-mail from Brenda Michalek, to the extent such documents exist (this category encompasses RFP No. 136);

42. All policy statements, guidelines, instructions, or correspondence to NCR managers from 2003-2008 regarding whether Customer Engineers in California were at-will employees, to the extent such documents exist (this category encompasses RFP Nos. 143-144);

43. All policy statements, guidelines, instructions, or correspondence to NCR managers from 2003-2008 regarding whether Customer Engineers in California could be disciplined or terminated only for cause, to the extent such documents exist (this category encompasses RFP Nos. 145-146);

44. All policy statements, guidelines, instructions, or correspondence to NCR employees explaining what in 2008 were grounds for immediate termination, to the extent such documents exist (this category encompasses RFP Nos. 149-150); and

45. All policy statements, guidelines, instructions, or correspondence to NCR employees explaining what in 2008 were the circumstances under which a territory manager's decision to terminate an employee could be subject to "reversal," to the extent such documents exist (this category encompasses RFP Nos. 151-152).

A.      The remaining document production categories in dispute.

The parties respective positions concerning these categories is as stated in the following format.  First, the text of the category and defendant's initial response are quoted verbatim, followed by plaintiff's argument of relevance to the claims or defenses, then defendant's argument/offer of compromise position, and closing with plaintiff's rebuttal/statement.

Then, the parties proffer memoranda of points and authorities in support of their respective positions.

**REQUEST FOR PRODUCTION NO. 6:**
Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, piece of correspondence, NCR intra-net posting, or other writing which advised a Customer Engineer in the 750B territory in calendar 2007 that he or she was being place on performance improvement program, regardless of whether signed or unsigned by the CE being place of the PIP.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**
Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, unduly burdensome, and seeks irrelevant documents.  Defendant also objects to this request on the grounds it demands documents protected by third-party privacy rights under the California and U.S. Constitutions and is vague and ambiguous as to the meaning of "piece of electronically stored information" and "other writing."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**
Plaintiff's discrimination claim is based, in part, upon disparate treatment of older employees.  Erick Aguilar's 4/30/08 YTD tally of his workgroup's SLAs (which he distributed by email dated 5/29/08) reflects that several employees had not met their SLA targets, among them Terry Doubt, Michael Knapp, Hieu Nguyen, Dante Banez, Mark Paulley, Gilbert Latorre, Ernesto Mendoza and Kenny Cheng.  However, the table produced by NCR, labeled NCRPROD 00197, shows that from mid  2008 through mid 2009 the *only* employees fired for "unsatisfactory performance" were all over 50 when fired, Terry Doubt, Michael Knapp, Hieu Nguyen, and Julio Medina, while Mark Paulley, Gilbert Latorre, Ernesto Mendoza and Kenny Cheng, were all significantly younger (and under 40), and as of whatever date NCR's tally was prepared, they were still "active" with the company.

As the employees in the workgroup were being judged on their SLA metrics, evidence of NCR treating significantly younger CEs who had not met their metrics less harshly than plaintiff (and other older CEs) is relevant to the disparate treatment claim in this action, *O'Connor, v.*

11

*Consolidated Coin Caterers Corp.* (1996) 511 U.S. 308, at 313, 116 S.Ct. 1307, at 1310, 134 L.Ed.2d 433.

Evidence that provides context or background to the events in question in the lawsuit is admissible, even if it is not conduct for which liability is imposed, *United Air Lines, Inc. v. Evans* (1977) 431 U.S. 553, at 558, 97 S.Ct. 1885, at 1889, 52 L. Ed.2d 571, *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara* (2003) 344 F.3d 822, at 829, and is therefor subject to discovery.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

This request is overly broad and burdensome in that the only arguably relevant and responsive documents would be the actual PIPs, whether signed or unsigned. The universe of electronically stored information is irrelevant to the fact that an individual was placed on a PIP when the PIP is the best evidence of what it contained. Defendant has agreed to produce all PIPs for Customer Engineers in the 750B territory, to the extent they can be located.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

Defendant appears to agree to produce the PIP memos themselves, but plaintiff contends that if some other document, whether cover letter or email addressed to the CE in question, also advised the CE he was being placed on performance improvement program, such other documents are relevant and should be produced.

Defendant's argument "The universe of electronically stored information is irrelevant to the fact that an individual was placed on a PIP. . ." is specious as the request itself is limited to documents "which advised a Customer Engineer in the 750B territory in calendar 2007 that he or she was being place on performance improvement program"

**REQUEST FOR PRODUCTION NO. 7:**

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, piece of correspondence, NCR intra-net posting, or other writing which advised a Customer Engineer in the 750B territory in calendar 2008 that he or she was being placed on performance improvement program, regardless of whether signed or unsigned by the CE being place on a PIP.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is overly broad, unduly burdensome, and seeks irrelevant documents. Defendant also objects to this request on the grounds it demands documents protected by third-party privacy rights under the California and U.S. Constitutions and is vague and ambiguous as to the meaning of "piece of electronically stored information" and "other writing."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Plaintiff's discrimination claim is based, in part, upon disparate treatment of older employees. Erick Aguilar's 4/30/08 YTD tally of his workgroup's SLAs (which he distributed by email dated 5/29/08) reflects that several employees had not met their SLA targets, among them Terry Doubt, Michael Knapp, Hieu Nguyen, Dante Banez, Mark Paulley, Gilbert Latorre, Ernesto Mendoza and Kenny Cheng. However, the table produced by NCR, labeled NCRPROD 00197, shows that from mid 2008 through mid 2009 the *only* employees fired for "unsatisfactory performance" were all over 50 when fired, Terry Doubt, Michael Knapp, Hieu Nguyen, and Julio Medina, while Mark Paulley, Gilbert Latorre, Ernesto Mendoza and Kenny Cheng, were all significantly younger (and under 40), and as of whatever date NCR's tally was prepared, they were still "active" with the company.

As the employees in the workgroup were being judged on their SLA metrics, evidence of NCR treating significantly younger CEs who had not met their metrics less harshly than plaintiff (and other older CEs) is relevant to the disparate treatment claim in this action, *O'Connor, v. Consolidated Coin Caterers Corp.* (1996) 511 U.S. 308, at 313, 116 S.Ct. 1307, at 1310, 134 L.Ed.2d 433.

Evidence that provides context or background to the events in question in the lawsuit is admissible, even if it is not conduct for which liability is imposed, *United Air Lines, Inc. v. Evans* (1977) 431 U.S. 553, at 558, 97 S.Ct. 1885, at 1889, 52 L. Ed.2d 571, *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara* (2003) 344 F.3d 822, at 829, and is therefor subject to discovery.

## DEFENDANT'S ARGUMENT/COMPROMISE:

This request is overly broad and burdensome in that the only arguably relevant and responsive documents would be the actual PIPs, whether signed or unsigned. The universe of electronically stored information is irrelevant to the fact that an individual was placed on a PIP when the PIP is the best evidence of what it contained. Defendant has agreed to produce all PIPs for Customer Engineers in the 750B territory, to the extent they can be located.

## PLAINTIFF'S REBUTTAL/COMPROMISE:

Defendant appears to agree to produce the PIP memos themselves, but plaintiff contends that if some other document, whether cover letter or email addressed to the CE in question, also advised the CE he was being placed on performance improvement program, such other documents are relevant and should be produced.

Defendant's argument "The universe of electronically stored information is irrelevant to the fact that an individual was placed on a PIP. . ." is specious as the request itself is limited to documents "which advised a Customer Engineer in the 750B territory in calendar 2008 that he or she was being place on performance improvement program"

## REQUEST FOR PRODUCTION NO. 8:

All emails, including attachments thereto, set by John Harvey to plaintiff Terry Doubt, whether individually or as part of a mailing to persons including but not limited to Doubt, while Harvey was Doubt's supervisor.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 8:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad as to scope and time, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "supervisor."

## PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:

John Harvey was plaintiff's supervisor from 2003-2005, and did the performance reviews for those years which NCR has failed to produce, and which contain Doubts written responses to Harvey's assessments.  Harvey's and/or NCR's destruction of these performance reviews creates an inference of NCR's consciousness of guilt going to NCR's entire defense case, *Thor vs. Boska* (1974) 38 Cal.App.3d 558, at 567, and *Warner Barnes & Co. vs. Kokosai Kisen Kabushiti Kaisha* (2d Cir., 1939) 102 F.2d 450, modified at 103 F.2d 430.

Moreover, evidence that provides context or background to the events in question in the lawsuit is admissible, even if it is not conduct for which liability is imposed, *United Air Lines, Inc. v. Evans* (1977) 431 U.S. 553, at 558, 97 S.Ct. 1885, at 1889, 52 L. Ed.2d 571, *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara* (2003) 344 F.3d 822, at 829, and is therefor subject to discovery.

## DEFENDANT'S ARGUMENT/COMPROMISE:

This request is overly broad and burdensome in that it could encompass virtually every e-mail and/or attachment whether or not related to Plaintiff's performance or Plaintiff's complaints about violations of law or working conditions for a period of at least three years.  Further, Defendant is informed and believes and on that basis, states that John Harvey's laptop computer crashed in early 2009 and no backup data exists.  This will require a search of other potential sources of electronically stored information and may require considerable time and expense.  If Plaintiff agrees to narrow the search to those areas relating to Plaintiff's performance and Plaintiff's complaints about violations of law or working conditions, as oppose to general work-related matters, Defendant will investigate the burden associated with this revised request and meet and confer with Plaintiff further.

## PLAINTIFF'S REBUTTAL/COMPROMISE:

At the February 10, 2010 early meeting of counsel, plaintiff provided a flash drive containing 8.63 gigabytes of information in 13,548 files, which included all of plaintiff's "mailbags" (emails sent and received going back several years) and various other electronic files.

Plaintiff's counsel advised defense counsel that missing from the mailbags was all of the Harvey-Doubt correspondence and that NCR's servers should still contain it.  Plaintiff believes that Harvey's emails with plaintiff are available on NCR's servers, and that NCR has failed to provide any basis to conclude that no NCR servers contain Harvey's mailbags.

14

It is far easier for NCR to simply locate the Harvey mailbags on their server and filter them to provide Harvey's correspondence with plaintiff, and provide it en masse, rather than actually try to search that correspondence to provide emails on particular subjects.

**REQUEST FOR PRODUCTION NO. 9:**

All emails, including attachments thereto, sent by plaintiff Terry Doubt to John Harvey, whether individually or as part of a mailing to persons including but not limited to Harvey, while Harvey was Doubt's supervisor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is overly broad as to scope and time, is unduly burdensome, and seeks irrelevant documents, and is vague and ambiguous as to the meaning of "supervisor."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

John Harvey was plaintiff's supervisor from 2003-2005, and did the performance reviews for those years which NCR has failed to produce, and which contain Doubts written responses to Harvey's assessments. Harvey's and/or NCR's destruction of these performance reviews creates an inference of NCR's consciousness of guilt going to NCR's entire defense case, *Thor vs. Boska* (1974) 38 Cal.App.3d 558, at 567, and *Warner Barnes & Co. vs. Kokosai Kisen Kabushiti Kaisha* (2d Cir., 1939) 102 F.2d 450, modified at 103 F.2d 430.

Moreover, evidence that provides context or background to the events in question in the lawsuit is admissible, even if it is not conduct for which liability is imposed, *United Air Lines, Inc. v. Evans* (1977) 431 U.S. 553, at 558, 97 S.Ct. 1885, at 1889, 52 L. Ed.2d 571, *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara* (2003) 344 F.3d 822, at 829, and is therefor subject to discovery.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

This request is overly broad and burdensome in that it could encompass virtually every e-mail and/or attachment whether or not related to Plaintiff's performance or Plaintiff's complaints about violations of law or working conditions for a period of at least three years. Further, Defendant is informed and believes and on that basis, states that John Harvey's laptop computer crashed in early 2009 and no backup data exists. This will require a search of other potential sources of electronically stored information and may require considerable time and expense. If Plaintiff agrees to narrow the search to those areas relating to Plaintiff's performance and Plaintiff's complaints about violations of law or working conditions, as oppose to general work-related matters, Defendant will investigate the burden associated with this revised request and meet and confer with Plaintiff further.

15

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

At the February 10, 2010 early meeting of counsel, plaintiff provided a flash drive containing 8.63 gigabytes of information in 13,548 files, which included all of plaintiff's "mailbags" (emails sent and received going back several years) and various other electronic files.

Plaintiff's counsel advised defense counsel that missing from the mailbags was all of the Harvey-Doubt correspondence and that NCR's servers should still contain it. Plaintiff believes that Harvey's emails with plaintiff are available on NCR's servers, and that NCR has failed to provide any basis to conclude that no NCR servers contain Harvey's mailbags.

It is far easier for NCR to simply locate the Harvey mailbags on their server and filter them to provide Harvey's correspondence with plaintiff, and provide it en masse, rather than actually try to search that correspondence to provide emails on particular subjects.

**REQUEST FOR PRODUCTION NO. 35:**

All charts, graphs or tables which reflect how the amount of plaintiff's bonus of $1,985.50 compared to other 2007 bonuses, if any, awarded to other Customer Engineers in the territory, 750B, in which plaintiff was employed. Text documents are to be produced electronically in either (a) "rich text format" (.rtf) or (b) MS Word format (.doc, not .docx), at the option of defendant NCR. Image documents are to be produced electronically in either JPEG (.jpg) or GIF (.gif) formats, at the option of defendant NCR. Documents containing both text and images may be produced in whatever electronic format (.gif, .jpg, .rtf or .doc) preserves the text and color scheme in the original.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and seeks information protected by third-party privacy rights. Defendant further objects to plaintiff's demand that any responsive documents be produced electronically, to the extent the responsive documents do not exist in electronic form or defendant would be required to incur additional expense to produce the documents electronically.

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Plaintiff alleges, *inter alia*, a claim of disparate treatment discrimination, based upon age.

The documents sought are relevant to the claims or defenses as plaintiff's 2007 bonus when compared to the bonuses received by other CEs in plaintiff's territory, would have a tendency to reflect how well or poorly other CEs' were performing in relation to plaintiff, which is directly relevant to the issue of whether was discharged for "Unsatisfactory Performance as NCR claims [NCRPROD 00197], and NCR's stated position that "Defendant maintains it terminated plaintiff's employment based on plaintiff's poor performance" [PLAINTIFF TERRY DOUBT'S AND DEFENDANT NCR CORPORATION'S JOINT CASE MANAGEMENT STATEMENT dated September 3, 2010, at p. 3].

**DEFENDANT'S ARGUMENT/COMPROMISE:**

To protect the rights of third parties, Defendant has suggested that the names of bonus recipients in Plaintiff's territory be redacted.  In the event the Court orders production, Defendant believes any electronically stored information should be produced in its native format or in a mutually agreeable electronic format which will preserve the data and metadata for each of the documents in question.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

Plaintiff agreed at the October 7th meeting between counsel that names of other bonus recipients could be redacted; what plaintiff wants is to see how his bonus amount compared to other bonuses being awarded, though not to any other named employee.

**REQUEST FOR PRODUCTION NO. 36:**

All charts, graphs or tables which reflect how the amount of plaintiff's bonus of $1,985.50 compared to other 2007 bonuses, if any, awarded to other Customer Engineers in the 750 region or sub area.  Text documents are to be produced electronically in either (a) "rich text format" (.rtf) or (b) MS Word format (.doc, not .docx), at the option of defendant NCR.  Image documents are to be produced electronically in either JPEG (.jpg) or GIF (.gif) formats, at the option of defendant NCR. Documents containing both text and images may be produced in whatever electronic format (.gif, .jpg, .rtf or .doc) preserves the text and color scheme in the original.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 36:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks information protected by third-party privacy rights, and seeks irrelevant documents.  Defendant further objects to plaintiff's demand that any responsive documents be produced electronically, to the extent the responsive documents do not exist in electronic form or defendant would be required to incur additional expense to produce the documents electronically.

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Plaintiff alleges, *inter alia*, a claim of disparate treatment discrimination, based upon age.

The documents sought are relevant to the claims or defenses as plaintiff's 2007 bonus when compared to the bonuses received by other CEs in in the 750 region or sub area in which plaintiff was employed, would have a tendency to reflect how well or poorly other CEs' were performing in relation to plaintiff, which is directly relevant to the issue of whether was discharged for "Unsatisfactory Performance as NCR claims [NCRPROD 00197], and NCR's stated position that "Defendant maintains it terminated plaintiff's employment based on plaintiff's poor performance" [PLAINTIFF TERRY DOUBT'S AND DEFENDANT NCR CORPORATION'S JOINT CASE MANAGEMENT STATEMENT dated September 3, 2010, at p. 3].

**DEFENDANT'S ARGUMENT/COMPROMISE:**

To protect the rights of third parties, Defendant has suggested that the names of bonus recipients in Plaintiff's territory be redacted.  In the event the Court orders production, Defendant believes any electronically stored information should be produced in its native format or in a mutually agreeable electronic format which will preserve the data and metadata for each of the documents in question.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

Plaintiff agreed at the October 7th meeting between counsel that names of other bonus recipients could be redacted; what plaintiff wants is to see how his bonus amount compared to other bonuses being awarded, though not to any other named employee.

**REQUEST FOR PRODUCTION NO. 37:**

All charts, graphs or tables which reflect how the amount of plaintiff's bonus of $1,985.50 compared to other 2007 bonuses, if any, awarded to other Customer Engineers in the Western area. Text documents are to be produced electronically in either (a) "rich text format" (.rtf) or (b) MS Word format (.doc, not .docx), at the option of defendant NCR.  Image documents are to be produced electronically in either JPEG (.jpg) or GIF (.gif) formats, at the option of defendant NCR. Documents containing both text and images may be produced in whatever electronic format (.gif, .jpg, .rtf or .doc) preserves the text and color scheme in the original.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks information protected by third-party privacy rights, and seeks irrelevant documents.  Defendant further objects to plaintiff's demand that any responsive documents be produced electronically, to the extent the responsive documents do not exist in electronic form or defendant would be required to incur additional expense to produce the documents electronically.

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Plaintiff alleges, *inter alia*, a claim of disparate treatment discrimination, based upon age.
The documents sought are relevant to the claims or defenses as plaintiff's 2007 bonus when compared to the bonuses received by other CEs in the Western Area in which plaintiff was employed, would have a tendency to reflect how well or poorly other CEs' were performing in relation to plaintiff, which is directly relevant to the issue of whether was discharged for "Unsatisfactory Performance as NCR claims [NCRPROD 00197], and NCR's stated position that "Defendant maintains it terminated plaintiff's employment based on plaintiff's poor performance" [PLAINTIFF TERRY DOUBT'S AND DEFENDANT NCR CORPORATION'S JOINT CASE MANAGEMENT STATEMENT dated September 3, 2010, at p. 3].

**DEFENDANT'S ARGUMENT/COMPROMISE:**

This request is overly broad in that it encompasses information about Customer Engineers in the entire Western area. Defendant proposes that the scope of this request be substantially limited. To protect the rights of third parties, Defendant has suggested that the names of bonus recipients in Plaintiff's territory be redacted. In the event the Court orders production, Defendant believes any electronically stored information should be produced in its native format or in a mutually agreeable electronic format which will preserve the data and metadata for each of the documents in question.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

Plaintiff agreed at the October 7th meeting between counsel that names of other bonus recipients could be redacted; what plaintiff wants is to see how his bonus amount compared to other bonuses being awarded, though not to any other named employee.

The request is not overly broad, as plaintiff alleges that the plan to get rid of higher earning CEs, who would necessarily be older, was a corporate effort, not that of a rogue manager. Moreover, the evidence in hand reflects that this was a corporate effort.

In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re: Hoyle directive re_2007 PIPs). When a request was made for more time for a member of plaintiff's Monterey workgroup, Michael Knapp, to improve his performance, NCR's HR manager refused that request, "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's**," (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

As NCR has proffered to colorable claim of burden in providing this information, plaintiff should be allowed to learn how his bonus compared to others, not merely to those in his workgroup of 18-20 persons.

**REQUEST FOR PRODUCTION NO. 38:**

All charts, graphs or tables which reflect how the amount of plaintiff's bonus of $1,985.50 compared to other 2007 bonuses, if any, awarded to other Customer Engineers nationwide. Text documents are to be produced electronically in either (a) "rich text format" (.rtf) or (b) MS Word format (.doc, not .docx), at the option of defendant NCR. Image documents are to be produced electronically in either JPEG (.jpg) or GIF (.gif) formats, at the option of defendant NCR. Documents containing both text and images may be produced in whatever electronic format (.gif, .jpg, .rtf or .doc) preserves the text and color scheme in the original.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks information protected by third-party privacy rights, and seeks irrelevant documents. Defendant further objects to plaintiff's demand that any responsive documents be

produced electronically, to the extent the responsive documents do not exist in electronic form or defendant would be required to incur additional expense to produce the documents electronically.

## PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:

Plaintiff alleges, *inter alia*, a claim of disparate treatment discrimination, based upon age.

The documents sought are relevant to the claims or defenses as plaintiff's 2007 bonus when compared to the bonuses received by other CEs nationwide, would have a tendency to reflect how well or poorly other CEs' were performing in relation to plaintiff, which is directly relevant to the issue of whether was discharged for "Unsatisfactory Performance as NCR claims [NCRPROD 00197], and NCR's stated position that "Defendant maintains it terminated plaintiff's employment based on plaintiff's poor performance" [PLAINTIFF TERRY DOUBT'S AND DEFENDANT NCR CORPORATION'S JOINT CASE MANAGEMENT STATEMENT dated September 3, 2010, at p. 3].

## DEFENDANT'S ARGUMENT/COMPROMISE:

This request is overly broad in that it encompasses information about Customer Engineers nation-wide.  Defendant proposes that the scope of this request be substantially limited.  To protect the rights of third parties, Defendant has suggested that the names of bonus recipients be redacted. In the event the Court orders production, Defendant believes any electronically stored information should be produced in its native format or in a mutually agreeable electronic format which will preserve the data and metadata for each of the documents in question.

## PLAINTIFF'S REBUTTAL/COMPROMISE:

Plaintiff agreed at the October 7th meeting between counsel that names of other bonus recipients could be redacted; what plaintiff wants is to see how his bonus amount compared to other bonuses being awarded, though not to any other named employee.

The request is not overly broad, as plaintiff alleges that the plan to get rid of higher earning CEs, who would necessarily be older, was a corporate effort, not that of a rogue manager. Moreover, the evidence in hand reflects that this was a corporate effort.

In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re:  Hoyle directive re_2007 PIPs).  When a request was made for more time for a member of plaintiff's Monterey workgroup, Michael Knapp, to improve his performance, NCR's HR manager refused that request,  "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's,**" (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

As NCR has proffered to colorable claim of burden in providing this information, plaintiff should be allowed to learn how his bonus compared to others, not merely to those in his workgroup of 18-20 persons.

## REQUEST FOR PRODUCTION NO. 89:

Each warning letter / PIP document prepared concerning any customer engineer 1 or customer engineer 2 employed in the continental United States who was place on PIP "light" or "lite" in 2008.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 89:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is overly broad, unduly burdensome, seeks irrelevant documents, and vague and ambiguous as to the meaning of "PIP document" and "warning letter" and "concerning." Defendant further objects on the grounds this request demands information protected from disclosure by third-privacy rights under the California and U.S. Constitutions.

## PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:

That NCR created a separate PIP know as "light" for some CEs is relevant to the claim of disparate treatment if those placed on the program had failed to meet their SLA metrics but were younger than CEs placed on regular PIP. The information sought is therefor relevant to the claim made in this action.

## DEFENDANT'S ARGUMENT/COMPROMISE:

This request is overly broad. How Customer Engineers employed throughout the Continental U.S. were treated by their respective supervisors and/or managers is irrelevant to the issues in this case. Plaintiff worked in one territory and relevant information would include only his treatment by his direct supervisors and managers. What other supervisors and managers do throughout the U.S. is not reasonably calculated to lead to the discovery of admissible evidence. This request is also overly broad as to time. The only relevant information would be comparators working in same territory under the same supervisors and managers during the same period. Plaintiff should be required to narrow this request substantially.

## PLAINTIFF'S REBUTTAL/COMPROMISE:

The request is not overly broad, as plaintiff alleges that the plan to get rid of higher earning CEs, who would necessarily be older, was a corporate effort, not that of a rogue manager. Moreover, the evidence in hand reflects that this was a corporate effort.

In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re: Hoyle directive re_2007 PIPs). When a request was made for more time for a member of plaintiff's Monterey workgroup, Michael Knapp, to improve his performance, NCR's HR manager refused that request, "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's**," (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

On April 29, 2008, NCR's former HR Manager II, Brenda Michalek, referred to "PIP lite" in an email directed to managers throughout the country, not merely plaintiff's workgroup [see tab CC, email from Michalek re: "Status of NI activity with term dates").

That some employees were put on PIP light, as opposed to others who happened to be older, like plaintiff who were put on regular PIP, and why, could not be more relevant.

As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

**REQUEST FOR PRODUCTION NO. 90:**

Each warning letter / PIP document prepared concerning any NCR customer engineer 1 or customer engineer 2 employed in the continental United States who was place on PIP "light" or "lite" in 2008 which bears his or her signature or other indication of receipt by him or her.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 90:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is duplicative of Request No. 89, is overly broad, unduly burdensome, seeks irrelevant documents, and vague and ambiguous as to the meaning of "PIP document" and "warning letter" and "concerning." Defendant further objects on the grounds this request demands information protected from disclosure by third-privacy rights under the California and U.S. Constitutions.

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

This category does not duplicate category 89 as that category seeks PIP warning letters that were merely prepared concerning the employee placed on PIP "light", and category 90 seeks those which bear his signature or other indication of receipt, reflecting it was presented to him and either he signed it or had the opportunity to do so.

That NCR created a separate PIP know as "light" for some CEs is relevant to the claim of disparate treatment if those placed on the program had failed to meet their SLA metrics but were younger than CEs placed on regular PIP. The information sought is therefor relevant to the claim made in this action.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

This request is overly broad. How Customer Engineers employed throughout the Continental U.S. were treated by their respective supervisors and/or managers is irrelevant to the issues in this case. Plaintiff worked in one territory and relevant information would include only his treatment by his direct supervisors and managers. What other supervisors and managers do throughout the U.S. is not reasonably calculated to lead to the discovery of admissible evidence. This request is also overly broad as to time. The only relevant information would be comparators working in same territory under the same supervisors and managers during the same period. Plaintiff should be required to narrow this request substantially.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

The request is not overly broad, as plaintiff alleges that the plan to get rid of higher earning CEs, who would necessarily be older, was a corporate effort, not that of a rogue manager. Moreover, the evidence in hand reflects that this was a corporate effort.

In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re: Hoyle directive re_2007 PIPs). When a request was made for more time for a member of plaintiff's Monterey workgroup, Michael Knapp, to improve his performance, NCR's HR manager refused that request, "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's**," (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

On April 29, 2008, NCR's former HR Manager II, Brenda Michalek, referred to "PIP lite" in an email directed to managers throughout the country, not merely plaintiff's workgroup [see tab CC, email from Michalek re: "Status of NI activity with term dates").

That some employees were put on PIP light, as opposed to others who happened to be older, like plaintiff who were put on regular PIP, and why, could not be more relevant.

As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

**REQUEST FOR PRODUCTION NO. 91:**

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence in calendar 2008 concerning the staffing level of the workgroup referred to as "Monterey" in Erick Aguilar's scheduling spreadsheets.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 91:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information" and "staffing level" and "scheduling spreadsheets."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Caselaw makes clear plaintiff must be allowed to show that the employer's proffered reason for the termination is untrue, "The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination, *Furnco Const. Corp. v. Waters* (1978) 438 U.S. 567, at 578, 98 S.Ct. 2943, at 2950, 57 L.Ed.2d 957, and one way of proving pretext is "by showing that the employer's proffered explanation is unworthy of credence," *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105.

23

In this case, that means showing that as alleged in the complaint, plaintiff was doing everything he could possibly do given the short-staffed team of himself and a trainee covering the area normally manned by four CEs.  On August 20, 2008,  less than a month before NCR fired plaintiff, Territory Manager Erick Aguilar, awarded plaintiff "POINTS!", with the comment "thanks for all the extra work to support the Monterey area during this difficult times."

The evidence sought is relevant to showing that the stated reasons for plaintiff's termination, "Unsatisfactory Performance", NCRPROD 00197, in particular failing to meet his SLA metrics, is not worthy of credence given the extraordinary workload plaintiff had to carry for the months preceding his firing in what were "difficult times" according to his superior.  As such, the evidence sought is relevant to the claims or defenses in this action.

### DEFENDANT'S ARGUMENT/COMPROMISE:

This request is overly broad and burdensome.  It is difficult to propose a compromise when the requested documents and electronically stored information could conceivably include each work order for each employee in the Monterey work group throughout the entire year.  This raw information would be virtually useless in addressing the issues raised in the Complaint.  Plaintiff should be required to narrow it substantially.

### PLAINTIFF'S REBUTTAL/COMPROMISE:

Plaintiff does not seek "raw information" such as work orders; what plaintiff wants are the documents that refer to or discuss the staffing level of the Monterey workgroup in the 750B team,

For example, but not by way of limitation, the schedule prepared for January 14-20, 2008 reflects that four men staffed the Monterey team:  Alex Vasser, Michael Knapp, Terry Doubt and Michael Sweeney (tab O), but all of five weeks later, February 26, 2008, Sweeney was gone, leaving the team with only three CEs, i.e., a man short (tab Q).

NCR has invoked a straw-man in arguing against providing the correspondence, if any, in which management discuss the short-staffing of the Monterey team, which in turn bears directly on plaintiff's claim that due to the team being short-staffed, it was impossible for him to make his SLA numbers, and that NCR was aware of this but fired him anyway.

### REQUEST FOR PRODUCTION NO. 128:

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that inquired in 2008 about the earnings of, and/or overtime worked by, a Customer Engineer whom NCR was considering to be either put on PIP, scheduled for termination, or terminated.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 128:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Plaintiff's disparate impact claim is based upon NCR weeding out and firing higher earning Customer Engineers who were older than lower earning CEs.

In California, "the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group" *Government Code* §12941.

The documents sought are relevant to show that older CEs, who as a group would, like plaintiff, be at the higher end of NCR's earning scale, were being fired, which is direct proof of age discrimination, which is one of plaintiff's claims in this action.

Direct proof of discrimination renders the *McDonnell Douglas* presumption inapplicable, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985), and renders irrelevant the employer's purported legitimate, non-discriminatory reason for the termination,  *Lee v. Russell County Board of Education* (11th Cir.1982) 684 F.2d 769, 774.

Moreover, NCR's payroll records concerning plaintiff disclose he worked huge amounts of overtime; when plaintiff submitted his overtime hours to Territory Manager Erick Aguilar on August 25, 2008, three weeks before NCR fired plaintiff, Doubt included the complaint that he was suffering **"**burnout" from all the overtime, and that as of 2:52am that morning he was sleeping in his car to be  able to respond to a request for service in Oakland but the customer contact was not answering her phone.

Plaintiff's complaint alleges separate claims for retaliatory discharge in response to complaints concerning (a) working conditions and (b) violations of law.

The documents sought are relevant to the issue of NCR's consideration of overtime being paid to an employee, or the amount thereof, California *Labor Code* §510(a) requires employers to pay overtime for work in excess of eight  hours per day, or forty hours per week, and the extent to which NCR wished to avoid paying overtime, e.g., by firing those who had put in large amounts of overtime, is relevant to the claim of discharge in violation of fundamental public policy, with one of the policies in question being the statutory requirement of paying overtime.

The paper trail reflects that NCR has for years been concerned with overtime expense. From the October 13, 2005, memo from then Territory Manager John Harvey entitled "Urgent: New Overtime Rules" to the September 10, 2008 email from Northwest Field Operations Manager John Harvey entitled "Important: NW Overtime Approval Process effective immediately" both underscore NCR's concern with overtime expense.

In March of 2008 NCR was hit with a class-action lawsuit alleging failure to pay overtime, *Teeter v. NCR*, which included plaintiff Terry Doubt as a class member, and which ultimately settled, with NCR paying plaintiff Doubt nearly three times the amount it paid the average class member.

As NCR was aware of the claim made on plaintiff's behalf long before it fired him, and recognized that he was a class member on whose behalf a complaint of failure to pay overtime was being made, NCR's policies concerning monitoring overtime is relevant to the claims for wrongful discharge made in this action.

Accordingly, evidence bearing upon NCR's use of salary, or overtime, as part of the mix when deciding whether to put an employee on PIP, or terminate him, could not be more relevant to plaintiff's claims in this action.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

This request is overly broad.  How Customer Engineers employed throughout the Continental U.S. were treated by their respective supervisors and/or managers is irrelevant to the issues in this case.  Plaintiff worked in one territory and relevant information would include only his treatment by his direct supervisors and managers.  What other supervisors and managers do throughout the U.S. is not reasonably calculated to lead to the discovery of admissible evidence.  This request is also overly broad as to time.  The only relevant information would be comparators working in same territory under the same supervisors and managers during the same period.  Further, as phrased, the earnings of Customer Engineers throughout the U.S. who were considered for PIPs or termination, irrespective of the reasons, would constitute responsive information.  Clearly, this request is burdensome and not calculated to address the issues in the 750B territory.  Plaintiff should be required to narrow this request substantially.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

The request is not overly broad, as plaintiff alleges that the plan to get rid of higher earning CEs, who would necessarily be older, was a corporate effort, not that of a rogue manager.  Moreover, the evidence in hand reflects that this was a corporate effort.

In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re:  Hoyle directive re_2007 PIPs).  When a request was made for more time for a member of plaintiff's Monterey workgroup, Michael Knapp, to improve his performance, NCR's HR manager refused that request,  "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's**," (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

NCR's management team acknowledged that cost-cutting had gone one, and was perceived as being directed at CEs.  In January of 2008 VP Chris Cheadle acknowledged that cost-cutting was creating dissension in the ranks:

> You will remember from the webcast, ACS has experienced flat profit performance over the past five years and no revenue growth.  This has driven the significant cost reductions that have been essential to keeping our business viable.  When there is no revenue growth – the only way to survive is through cost-cutting.  **I know the organization is tired of cost-cutting**; it is hard and unpopular.
>
> **There is a perception that these changes were all about cutting cost, and targeted at the CE population**. . .

Tab P, 01/21/08 Cheadle Very Important Message Regarding Americas CS Organization Changes.

As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office.  Put another way, an email by a territory  manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

## REQUEST FOR PRODUCTION NO. 129:

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that responded to the inquiry in 2008 about the earnings of, and/or overtime worked by, a Customer Engineer whom NCR was considering to be either put on PIP, scheduled for termination, or terminated.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 129:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, seeks information protected by third-party privacy rights, and is vague and ambiguous as to the meaning of "piece of electronically stored information."

## PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:

Plaintiff's disparate impact claim is based upon NCR weeding out and firing higher earning Customer Engineers who were older than lower earning CEs.

In California, "the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group" *Government Code* §12941.

The documents sought are relevant to show that older CEs, who as a group would, like plaintiff, be at the higher end of NCR's earning scale, were being fired, which is direct proof of age discrimination, which is one of plaintiff's claims in this action.

Direct proof of discrimination renders the *McDonnell Douglas* presumption inapplicable, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985), and renders irrelevant the employer's purported legitimate, non-discriminatory reason for the termination,  *Lee v. Russell County Board of Education* (11th Cir.1982) 684 F.2d 769, 774.

Moreover, NCR's payroll records concerning plaintiff disclose he worked huge amounts of overtime; when plaintiff submitted his overtime hours to Territory Manager Erick Aguilar on August 25, 2008, three weeks before NCR fired plaintiff, Doubt included the complaint that he was suffering "burnout" from all the overtime, and that as of 2:52am that morning he was sleeping in his car to be  able to respond to a request for service in Oakland but the customer contact was not answering her phone.

Plaintiff's complaint alleges separate claims for retaliatory discharge in response to

complaints concerning (a) working conditions and (b) violations of law.

The documents sought are relevant to the issue of NCR's consideration of overtime being paid to an employee, or the amount thereof, California *Labor Code* §510(a) requires employers to pay overtime for work in excess of eight hours per day, or forty hours per week, and the extent to which NCR wished to avoid paying overtime, e.g., by firing those who had put in large amounts of overtime, is relevant to the claim of discharge in violation of fundamental public policy, with one of the policies in question being the statutory requirement of paying overtime.

The paper trail reflects that NCR has for years been concerned with overtime expense. From the October 13, 2005, memo from then Territory Manager John Harvey entitled "Urgent: New Overtime Rules" to the September 10, 2008 email from Northwest Field Operations Manager John Harvey entitled "Important: NW Overtime Approval Process effective immediately" both underscore NCR's concern with overtime expense.

In March of 2008 NCR was hit with a class-action lawsuit alleging failure to pay overtime, *Teeter v. NCR*, which included plaintiff Terry Doubt as a class member, and which ultimately settled, with NCR paying plaintiff Doubt nearly three times the amount it paid the average class member.

As NCR was aware of the claim made on plaintiff's behalf long before it fired him, and recognized that he was a class member on whose behalf a complaint of failure to pay overtime was being made, NCR's policies concerning monitoring overtime is relevant to the claims for wrongful discharge made in this action.

Accordingly, evidence bearing upon NCR's use of salary, or overtime, as part of the mix when deciding whether to put an employee on PIP, or terminate him, could not be more relevant to plaintiff's claims in this action.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

This request is overly broad. How Customer Engineers employed throughout the Continental U.S. were treated by their respective supervisors and/or managers is irrelevant to the issues in this case. Plaintiff worked in one territory and relevant information would include only his treatment by his direct supervisors and managers. What other supervisors and managers do throughout the U.S. is not reasonably calculated to lead to the discovery of admissible evidence. This request is also overly broad as to time. The only relevant information would be comparators working in same territory under the same supervisors and managers during the same period. Further, as phrased, the earnings of Customer Engineers throughout the U.S. who were considered for PIPs or termination, irrespective of the reasons, would constitute responsive information. Clearly, this request is burdensome and not calculated to address the issues in the 750B territory. Plaintiff should be required to narrow this request substantially.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

The request is not overly broad, as plaintiff alleges that the plan to get rid of higher earning CEs, who would necessarily be older, was a corporate effort, not that of a rogue manager. Moreover, the evidence in hand reflects that this was a corporate effort.

In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re: Hoyle directive re_2007 PIPs). When a request was made for more time for a member of plaintiff's Monterey workgroup, Michael Knapp, to

28

improve his performance, NCR's HR manager refused that request, "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's**," (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

NCR's management team acknowledged that cost-cutting had gone one, and was perceived as being directed at CEs.  In January of 2008 VP Chris Cheadle acknowledged that cost-cutting was creating dissension in the ranks:

> You will remember from the webcast, ACS has experienced flat profit performance over the past five years and no revenue growth.  This has driven the significant cost reductions that have been essential to keeping our business viable.  When there is no revenue growth – the only way to survive is through cost-cutting.  **I know the organization is tired of cost-cutting**; it is hard and unpopular.
>
> **There is a perception that these changes were all about cutting cost, and targeted at the CE population**. . .

Tab P, 01/21/08 Cheadle Very Important Message Regarding Americas CS Organization Changes.

As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office.  Put another way, an email by a territory  manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

## REQUEST FOR PRODUCTION NO. 130:

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, referred to or discussed reducing labor expense of Customer Engineers as part of any cost cutting in 2007 or 2008, as reflected by Chris Cheadle's 1/21/08 email in which he noted "I know the organization is tired of cost-cutting; it is hard and unpopular," which was produced by plaintiff to defendant on March 29, 2010.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 130:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Plaintiff's disparate impact claim is based upon NCR weeding out and firing higher earning Customer Engineers who were older than lower earning CEs.

In California, "the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group" *Government Code* §12941.

The documents sought are relevant to show that older CEs, who as a group would, like plaintiff, be at the higher end of NCR's earning scale, were being fired, which is direct proof of age discrimination, which is one of plaintiff's claims in this action.

Direct proof of discrimination renders the *McDonnell Douglas* presumption inapplicable, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985), and renders irrelevant the employer's purported legitimate, non-discriminatory reason for the termination, *Lee v. Russell County Board of Education* (11th Cir.1982) 684 F.2d 769, 774.

Moreover, NCR's payroll records concerning plaintiff disclose he worked huge amounts of overtime; when plaintiff submitted his overtime hours to Territory Manager Erick Aguilar on August 25, 2008, three weeks before NCR fired plaintiff, Doubt included the complaint that he was suffering **"**burnout" from all the overtime, and that as of 2:52am that morning he was sleeping in his car to be  able to respond to a request for service in Oakland but the customer contact was not answering her phone.

Plaintiff's complaint alleges separate claims for retaliatory discharge in response to complaints concerning (a) working conditions and (b) violations of law.

The documents sought are relevant to the issue of NCR's consideration of overtime being paid to an employee, or the amount thereof, California *Labor Code* §510(a) requires employers to pay overtime for work in excess of eight  hours per day, or forty hours per week, and the extent to which NCR wished to avoid paying overtime, e.g., by firing those who had put in large amounts of overtime, is relevant to the claim of discharge in violation of fundamental public policy, with one of the policies in question being the statutory requirement of paying overtime.

The paper trail reflects that NCR has for years been concerned with overtime expense. From the October 13, 2005, memo from then Territory Manager John Harvey entitled "Urgent: New Overtime Rules" to the September 10, 2008 email from Northwest Field Operations Manager John Harvey entitled "Important: NW Overtime Approval Process effective immediately" both underscore NCR's concern with overtime expense.

In March of 2008 NCR was hit with a class-action lawsuit alleging failure to pay overtime, *Teeter v. NCR*, which included plaintiff Terry Doubt as a class member, and which ultimately settled, with NCR paying plaintiff Doubt nearly three times the amount it paid the average class member.

As NCR was aware of the claim made on plaintiff's behalf long before it fired him, and recognized that he was a class member on whose behalf a complaint of failure to pay overtime was being made, NCR's policies concerning monitoring overtime is relevant to the claims for wrongful discharge made in this action.

Accordingly, evidence bearing upon NCR's consideration of labor expense when discussing cost cutting is relevant to the claims or defense in this action.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

      This request is overly broad.  The subject of reducing the labor expense of Customer Engineers or any other cost cutting measures implemented in 2007 or 2008 is overly broad and not calculated to lead to the discovery of admissible evidence, in that the general topics of "reduction of labor expense" and "cost cutting" are so vague and ambiguous as to be meaningless.  The statement "I know the organization is tired of cost-cutting; it is hard and unpopular" is neutral and does not indicate in and of itself any bias or predisposition regarding any protected classification. Plaintiff should be required to either withdraw or substantially narrow this request.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

      The request is not overly broad, as plaintiff alleges that the plan to get rid of higher earning CEs, who would necessarily be older, was a corporate effort, not that of a rogue manager. Moreover, the evidence in hand reflects that this was a corporate effort.

      In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re:  Hoyle directive re_2007 PIPs).  When a request was made for more time for a member of plaintiff's Monterey workgroup, Michael Knapp, to improve his performance, NCR's HR manager refused that request,  "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's**," (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

      NCR's management team acknowledged that cost-cutting had gone one, and was perceived as being directed at CEs.  In January of 2008 VP Chris Cheadle acknowledged that cost-cutting was creating dissension in the ranks:

> You will remember from the webcast, ACS has experienced flat profit performance over the past five years and no revenue growth.  This has driven the significant cost reductions that have been essential to keeping our business viable. When there is no revenue growth – the only way to survive is through cost-cutting.  **I know the organization is tired of cost-cutting**; it is hard and unpopular.
>
> **There is a perception that these changes were all about cutting cost, and targeted at the CE population**. . .

Tab P, 01/21/08 Cheadle Very Important Message Regarding Americas CS Organization Changes.

      If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office.  Put another way, an email by a territory  manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

      As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

**REQUEST FOR PRODUCTION NO. 131:**
  Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that reflects NCR's calculations, whether preliminary or final, prior to September 15, 2008 of the amount that might have to be paid to plaintiff Terry Doubt as a result of the *Teeter v. NCR* class action, ED CV 09-00297-SGL.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 131:**
  Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."  Defendant also objects to the extent this request calls for production of documents protected by the attorney-client privilege or attorney work product doctrine.

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**
  Plaintiff does not require production of any document addressed to a lawyer, or emanating from a lawyer, and no privilege log is required for any such documents.  If NCR contends that documents other than those addressed to a lawyer, or emanating from a lawyer, are privileged, then those documents should be identified in a privilege log.
  NCR's payroll records concerning plaintiff disclose he worked huge amounts of overtime; when plaintiff submitted his overtime hours to Territory Manager Erick Aguilar on August 25, 2008, three weeks before NCR fired plaintiff, Doubt included the complaint that he was suffering **"**burnout" from all the overtime, and that as of 2:52am that morning he was sleeping in his car to be  able to respond to a request for service in Oakland but the customer contact was not answering her phone.
  Plaintiff's complaint alleges separate claims for retaliatory discharge in response to complaints concerning (a) working conditions and (b) violations of law.
  The documents sought are relevant to the issue of NCR's consideration of overtime being paid to an employee, or the amount thereof, California *Labor Code* §510(a) requires employers to pay overtime for work in excess of eight  hours per day, or forty hours per week, and the extent to which NCR wished to avoid paying overtime, e.g., by firing those who had put in large amounts of overtime, is relevant to the claim of discharge in violation of fundamental public policy, with one of the policies in question being the statutory requirement of paying overtime.
  The paper trail reflects that NCR has for years been concerned with overtime expense. From the October 13, 2005, memo from then Territory Manager John Harvey entitled "Urgent: New Overtime Rules" to the September 10, 2008 email from Northwest Field Operations Manager

John Harvey entitled "Important: NW Overtime Approval Process effective immediately" both underscore NCR's concern with overtime expense.

In March of 2008 NCR was hit with a class-action lawsuit alleging failure to pay overtime, *Teeter v. NCR*, which included plaintiff Terry Doubt as a class member, and which ultimately settled, with NCR paying plaintiff Doubt nearly three times the amount it paid the average class member.

As NCR was aware of the claim made on plaintiff's behalf long before it fired him, and recognized that he was a class member on whose behalf a complaint of failure to pay overtime was being made, evidence bearing upon NCR's consideration of the amount of overtime it might have to pay to plaintiff in settlement of his class claim in *Teeter v. NCR* is relevant to the claims or defense in this action.

## DEFENDANT'S ARGUMENT/COMPROMISE:

Defendant reiterates the objections as set forth above.  The amount paid to Plaintiff as a result of a class action settlement is irrelevant.  Defendant respectfully requests that this request be withdrawn or stricken by the Court.

## PLAINTIFF'S REBUTTAL/COMPROMISE:

Plaintiff's first amended complaint specifically alleges at paragraphs 51-54 that one of the motivating reasons for NCR's termination of his employment was learning of the Teeter case in April of 2008, and wishing to be rid of those employees, like plaintiff, to whom NCR would have to pay a significant sum as a result of the claim having been brought.  Discovery seeking when NCR made preliminary calculations of what it might have to pay to plaintiff, and with whom NCR shared that information, could not be more relevant.

As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

## REQUEST FOR PRODUCTION NO. 132:

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that reflects with whom at NCR was shared NCR's calculations, whether preliminary or final, prior to September 15, 2008 of the amount that might have to be paid to plaintiff Terry Doubt as a result of the *Teeter v. NCR* class action, ED CV 09-00297-SGL.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 132:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is duplicative of Request No. 131, is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."  Defendant also

objects to the extent this request calls for production of documents protected by the attorney-client privilege or attorney work product doctrine.

## PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:

Plaintiff does not require production of any document addressed to a lawyer, or emanating from a lawyer, and no privilege log is required for any such documents.  If NCR contends that documents other than those addressed to a lawyer, or emanating from a lawyer, are privileged, then those documents should be identified in a privilege log.

This category does not duplicate category 131 which concerns NCR's computation **the** amount it might have to pay to plaintiff as category 132 seeks documents reflecting with whom NCR shared those calculations.

NCR's payroll records concerning plaintiff disclose he worked huge amounts of overtime; when plaintiff submitted his overtime hours to Territory Manager Erick Aguilar on August 25, 2008, three weeks before NCR fired plaintiff, Doubt included the complaint that he was suffering **"**burnout" from all the overtime, and that as of 2:52am that morning he was sleeping in his car to be  able to respond to a request for service in Oakland but the customer contact was not answering her phone.

Plaintiff's complaint alleges separate claims for retaliatory discharge in response to complaints concerning (a) working conditions and (b) violations of law.

The documents sought are relevant to the issue of NCR's consideration of overtime being paid to an employee, or the amount thereof, California *Labor Code* §510(a) requires employers to pay overtime for work in excess of eight  hours per day, or forty hours per week, and the extent to which NCR wished to avoid paying overtime, e.g., by firing those who had put in large amounts of overtime, is relevant to the claim of discharge in violation of fundamental public policy, with one of the policies in question being the statutory requirement of paying overtime.

The paper trail reflects that NCR has for years been concerned with overtime expense. From the October 13, 2005, memo from then Territory Manager John Harvey entitled "Urgent: New Overtime Rules" to the September 10, 2008 email from Northwest Field Operations Manager John Harvey entitled "Important: NW Overtime Approval Process effective immediately" both underscore NCR's concern with overtime expense.

In March of 2008 NCR was hit with a class-action lawsuit alleging failure to pay overtime, *Teeter v. NCR*, which included plaintiff Terry Doubt as a class member, and which ultimately settled, with NCR paying plaintiff Doubt nearly three times the amount it paid the average class member.

As NCR was aware of the claim made on plaintiff's behalf long before it fired him, and recognized that he was a class member on whose behalf a complaint of failure to pay overtime was being made, with whom NCR shared the computations of its potential liability to Doubt in settlement of his class claim in *Teeter v. NCR* is relevant to the claims or defense in this action.

## DEFENDANT'S ARGUMENT/COMPROMISE:

Defendant reiterates the objections as set forth above.  The amount paid to Plaintiff as a result of a class action settlement is irrelevant.  Defendant respectfully requests that this request be withdrawn or stricken by the Court.

Defendant reiterates the objections as set forth above.  The amount paid to Plaintiff as a result of a class action settlement is irrelevant.  Defendant respectfully requests that this request be withdrawn or stricken by the Court.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

Plaintiff's first amended complaint specifically alleges at paragraphs 51-54 that one of the motivating reasons for NCR's termination of his employment was learning of the Teeter case in April of 2008, and wishing to be rid of those employees, like plaintiff, to whom NCR would have to pay a significant sum as a result of the claim having been brought.  Discovery seeking when NCR made preliminary calculations of what it might have to pay to plaintiff, and with whom NCR shared that information, could not be more relevant.

As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

**REQUEST FOR PRODUCTION NO. 133:**

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that prior to September 15, 2008 reflects NCR employees or consultants discussing, reflecting upon, or speculating as to, any amounts that might have to be paid to Customer Engineer 2s and a group as a result of the *Teeter v. NCR* class action, ED CV 08-00297-SGL.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 133:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."  Defendant also objects to the extent this request calls for production of documents protected by the attorney-client privilege or attorney work product doctrine.

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Plaintiff does not require production of any document addressed to a lawyer, or emanating from a lawyer, and no privilege log is required for any such documents.  If NCR contends that documents other than those addressed to a lawyer, or emanating from a lawyer, are privileged, then those documents should be identified in a privilege log.

This category does not duplicate category 131 which concerns NCR's computation **the** amount it might have to pay to plaintiff, or category 132 which seeks documents reflecting with whom NCR shared those calculations.  Category 133 seeks information concerning the calculations of the amount that might have to be paid to CEs as a group to settle the *Teeter v. NCR* class action.

Plaintiff's complaint alleges separate claims for retaliatory discharge in response to complaints concerning (a) working conditions and (b) violations of law.

The documents sought are relevant to the issue of NCR's consideration of overtime being paid to the group of employees, CE2s, which included plaintiff.

As NCR was aware of the claim made on plaintiff's behalf long before it fired him, and recognized that he was a class member on whose behalf a complaint of failure to pay overtime was being made, evidence reflecting NCR's calculations of what it might have to pay those sharing plaintiff's job title in settlement of the class claim in *Teeter v. NCR* is relevant to the claims or defense in this action.

## DEFENDANT'S ARGUMENT/COMPROMISE:

Defendant reiterates the objections as set forth above.  The amount paid to Plaintiff as a result of a class action settlement is irrelevant.  Speculating as to any amounts that might have been paid to other Customer Engineers as result of class is action is clearly irrelevant and may be protected by the work product privilege and attorney-client privilege.  Defendant respectfully requests that this request be withdrawn or stricken by the Court.

## PLAINTIFF'S REBUTTAL/COMPROMISE:

Plaintiff's first amended complaint specifically alleges at paragraphs 51-54 that one of the motivating reasons for NCR's termination of his employment was learning of the Teeter case in April of 2008, and wishing to be rid of those employees, like plaintiff, to whom NCR would have to pay a significant sum as a result of the claim having been brought.  Discovery seeking when NCR made preliminary calculations of what it might have to pay to plaintiff, and with whom NCR shared that information, could not be more relevant.

Plaintiff acknowledges that the contents of any writings directed to or received from an attorney may be subject to a claim of privilege, but NCR should be ordered to provide a privilege log as to any documents withheld on the basis of attorney client or attorney work-product.

As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

## REQUEST FOR PRODUCTION NO. 134:

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that prior to September 15, 2008 reflects with whom at NCR was shared NCR employees' or consultants discussing, reflecting upon, or speculating as to, any amounts that might have to be paid to Customer Engineer 2s and a group as a result of the *Teeter v. NCR* class action, ED CV 08-00297-SGL.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 134:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is

expected shortly.  Defendant further objects to this request on the grounds it is duplicative of Request No. 133, is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."  Defendant also objects to the extent this request calls for production of documents protected by the attorney-client privilege or attorney work product doctrine.

## PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:

Plaintiff does not require production of any document addressed to a lawyer, or emanating from a lawyer, and no privilege log is required for any such documents.  If NCR contends that documents other than those addressed to a lawyer, or emanating from a lawyer, are privileged, then those documents should be identified in a privilege log.

This category does not duplicate category 133 which seeks information concerning the calculations of the amount that might have to be paid to CEs as a group to settle the *Teeter v. NCR* class action.  Category 134 which seeks documents reflecting with whom NCR shared those calculations.

Plaintiff's complaint alleges separate claims for retaliatory discharge in response to complaints concerning (a) working conditions and (b) violations of law.

The documents sought are relevant to the issue of NCR's sharing with members of management the amount of overtime NCR might have to pay to the group of employees, CE2s, which included plaintiff.

As NCR was aware of the claim made on plaintiff's behalf long before it fired him, and recognized that he was a class member on whose behalf a complaint of failure to pay overtime was being made, evidence reflecting NCR's sharing its calculations of what it might have to pay those sharing plaintiff's job title in settlement of the class claim in *Teeter v. NCR* is relevant to the claims or defense in this action.

## DEFENDANT'S ARGUMENT/COMPROMISE:

Defendant reiterates the objections as set forth above.  The amount paid to Plaintiff as a result of a class action settlement is irrelevant.  Speculating as to any amounts that might have been paid to other Customer Engineers as result of class is action is clearly irrelevant and may be protected by the work product privilege and attorney-client privilege.  Defendant respectfully requests that this request be withdrawn or stricken by the Court.

## PLAINTIFF'S REBUTTAL/COMPROMISE:

Plaintiff's first amended complaint specifically alleges at paragraphs 51-54 that one of the motivating reasons for NCR's termination of his employment was learning of the Teeter case in April of 2008, and wishing to be rid of those employees, like plaintiff, to whom NCR would have to pay a significant sum as a result of the claim having been brought.  Discovery seeking when NCR made preliminary calculations of what it might have to pay to plaintiff, and with whom NCR shared that information, could not be more relevant.

Plaintiff acknowledges that the contents of any writings directed to or received from an attorney may be subject to a claim of privilege, but NCR should be ordered to provide a privilege log as to any documents withheld on the basis of attorney client or attorney work-product.

As NCR has proffered to colorable claim of burden in providing this information, it should be ordered, particularly as plaintiff has stipulate to a protective order limiting dissemination of the information should NCR mark it confidential.

## REQUEST FOR PRODUCTION NO. 137:

Each and every piece of electronically stored information that constituted the file(s) concerning the "297 NI employees" that existed on the "shared drive" as of April 29, 2008 the was referred to in the 04-29-08 email from Vicki Rennick which NCR produced on or about March 31, 2010, bearing Bates # NCRPROD 00175.  This information is to be produced electronically, with metadata intake regardless of the format, in (a) rich text format (.rft), or (b) MS Word format (.doc. not .docx), or (c) Excel (.xls, not .xlsx) format, at the option of defendant NCR.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 137:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."  Defendant also objects to the extent this request calls for production of documents protected by third-party privacy rights.  Defendant also objects to plaintiff's demand that any responsive documents be produced electronically, to the extent the responsive documents do not exist in electronic form or defendant would be required to incur additional expense to produce the documents electronically.

## PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:

The discovery sought is relevant to the claims or defenses as this is the population of allegedly non-performing Customer Engineers who were the subject of the Hoyle directive that led to NCR firing plaintiff.

As NCR claims a legitimate, non-discriminatory reason for firing plaintiff, "Unsatisfactory Performannce" NCRPROD 00197, discovery concerning others who were identified in early 2008 as being non-performing is relevant to the claims or defenses in this action as the information sought may reveal either the ages or the earnings level of those being slated for eventual termination, both of which are relevant to the claims or defenses in this action as plaintiff contends both disparate impact and disparate treatment.

## DEFENDANT'S ARGUMENT/COMPROMISE:

By seeking information as to how Defendant may have acted toward other individuals throughout the U.S., Plaintiff is essentially trying to require production of evidence which would be excluded under FRCP Rules 404, 607, 608 and 609.  Evidence of how Defendant may have treated other employees who were on PIPs is not admissible for the purpose of showing Plaintiff was discriminated or retaliated against on the basis of any protected category.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

The request is not overly broad, as plaintiff alleges that the plan to get rid of higher earning CEs, who would necessarily be older, was a corporate effort, not that of a rogue manager, and the fact that the information sought was being referred to by a member of NCR's HR management, Vicki Rennick, reflects that this was a corporate effort, as does other evidence already in hand.

In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re: Hoyle directive re_2007 PIPs). When a request was made for more time for a member of plaintiff's Monterey workgroup, Michael Knapp, to improve his performance, NCR's HR manager refused that request, "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's**," (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

As NCR has proffered to colorable claim of burden in providing this information, NCR should be ordered to produce the documents sought, which it may mark as confidential pursuant to the stipulated protective order.

**REQUEST FOR PRODUCTION NO. 138:**

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that was circulated among NCR management that reflects NCR management awareness and/or discussion of the 10-29-05 Adolph C Niehoff posting re: "NCR culture" which contained the statement "I am tired of working sixty to ninety hour weeks, while management continues to talk of trimming more people. I do hope and pray that soon, it will become a requirement for Dayton desk jockeys to spend two weeks down here in the trenches with the rest of us', a copy of which was produced by plaintiff to defendant on or about February 10, 2010.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 138:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

As plaintiff's complaint asserts that he was retaliated against for having voiced complaints concerning working conditions (CPT at p.3, ¶11; pp.4-5, ¶¶18-21) evidence reflecting similar complaints from other workers, and NCR's awareness of or reactions to them, are inarguably relevant to the claims or defenses in this action as evidence that may not support liability because, for example, the conduct occurred outside the limitations period, is nonetheless relevant to motive and to show the context of later events, *Carpinteria Valley Farms,* 344 F.3d at 829, *United Air Lines, Inc. v. Evans* (1977) 431 U.S. 553, at 558, 97 S.Ct. 1885, at 1889, 52 L. Ed.2d 571.

Moreover, plaintiff makes a claim for punitive damages based upon retaliatory discharge in response to complaints concerning the working conditions, so that NCR's knowledge of other complaints about the working conditions, in particular the crushing workload that required CEs to put in substantial overtime, is relevant to a claim or defense in the action, "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible," *Philip Morris USA v. Williams* (2007) 549 U.S.346, at 355, 127 S. Ct. 1057, at 1064, 166 L. Ed. 2d 940.

**DEFENDANT'S ARGUMENT/COMPROMISE:**
The information sought is remote in time and irrelevant to the issues in this case. The request is also overly broad because it not limited to any geographical area. There is no showing that this impacted Plaintiff in any way or that the "NCR Culture" referred to is germane to the issue of age discrimination or retaliation. This request should be narrowed substantially or stricken.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**
NCR's knowledge of, and response to, complaints concerning CE workload and burn-out could not be more relevant. Plaintiff alleges claims for retaliation based upon complaints concerning working conditions, and NCR management was certainly aware of some of those complaints:

> You will remember from the webcast, ACS has experienced flat profit performance over the past five years and no revenue growth. This has driven the significant cost reductions that have been essential to keeping our business viable. When there is no revenue growth – the only way to survive is through cost-cutting. **I know the organization is tired of cost-cutting**; it is hard and unpopular.
>
> **There is a perception that these changes were all about cutting cost, and targeted at the CE population**. . .

Tab P, 01/21/08 Cheadle Very Important Message Regarding Americas CS Organization Changes.
As NCR has proffered to colorable claim of burden in providing this information, plaintiff should be allowed to learn what NCR knew of complaints about the workload CEs had to bear and what NCR's responses, if any, to those complaints were.
If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office. Put another way, an email by a territory manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

**REQUEST FOR PRODUCTION NO. 139 [as corrected by the 7/6/10 notice of errata]:**
Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating

from someone, rather than being part of a manual, that was circulated among NCR management that reflects NCR management awareness of, and/or discussion of, the allegation that "some Customer Engineers were being told by local management to generate HHT (hand held terminal) calls in order to improve SLAs" that is contained in Chris Cheadle's 11/13/07 **email**, a copy of which was produced by plaintiff to defendant on March 29, 2010.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 139:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information" and "reflects … awareness."

## PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:

Caselaw makes clear plaintiff must be allowed to show that the employer's proffered reason for the termination is untrue, "The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination, *Furnco Const. Corp. v. Waters* (1978) 438 U.S. 567, at 578, 98 S.Ct. 2943, at 2950, 57 L.Ed.2d 957, and one way of proving pretext is "by showing that the employer's proffered explanation is unworthy of credence," *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, at 143, 120 S.Ct. 2097,  147 L.Ed.2d 105.

In this case, that means showing that SLAs were such an unrealistic measure of CE performance that not only did a Territory Manager tell a CE to create a untrue on the spot service call record to boost the CE's SLAs, which is relevant to NCR's purported legitimate, non-discriminatory reason for firing plaintiff, but also that Senior NCR management was aware of this practice and continued to use SLAs as a basis for firing employees, which is therefor relevant to plaintiff's claim for punitive damages, i.e, showing malice, and therefor relevant to that claim in this action.  "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible," *Philip Morris USA v. Williams*  (2007) 549 U.S.346, at 355, 127 S. Ct. 1057, at 1064, 166 L. Ed. 2d 940.

The evidence sought is relevant to showing that the stated reasons for plaintiff's termination, "Unsatisfactory Performance", NCRPROD 00197, in particular failing to meet his SLA metrics, is not worthy of credence given the extraordinary workload plaintiff had to carry for the months preceding his firing in what were "difficult times" according to his superior.  As such, the evidence sought is relevant to the claims or defenses in this action.

## DEFENDANT'S ARGUMENT/COMPROMISE:

This request is overly broad in that it applies to all NCR management throughout the entire organization without limitation as to time.  The allegation that Customer Engineers were being told to generate HHT calls by "local management" who are unidentified does not indicate (1) any local

management made such a directive to Doubt, (2) age discrimination, (3) retaliation, or (4) quality of work performance as measured on PIPs or performance evaluations.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

Plaintiff contends that NCR senior management was well aware (1)  that SLAs were an artificial measure of CE productivity, and (2) that they should not be blindly relied upon as a basis for firing a CE, both of which contentions are supported by Cheadle's email in late 2007, less than a year before plaintiff was fired:

> During Chris Wallace's Town Hall webcast earlier this month, a concern was raised that some Customer Engineers were being told by local management to generate HHT (hand held terminal) calls in order to improve SLAs.  I commend the CE who voiced his concern.  While the intent of the request was not to improve SLAs, it is easy to see how the request could have been interpreted this way.  This incident reinforces the need for each of us to communicate clearly and question that which does not seem right or make sense to us.

Tab N, 11/13/07 Cheadle email re:  Importance of Data Integrity in our business.

As NCR has proffered no colorable claim of burden, full production of responsive documents should be ordered.

If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office.  Put another way, an email by a territory  manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

**REQUEST FOR PRODUCTION NO. 140 [as corrected by the 7/6/10 notice of errata]:**

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that was **sent to or from, or** circulated among NCR management that reflects NCR management awareness in 2008 of, and/or discussion of, Customer Engineers' workload in 2008.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 140:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information" and "reflects … awareness" and "workload."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

Caselaw makes clear plaintiff must be allowed to show that the employer's proffered reason for the termination is untrue, "The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination, *Furnco Const. Corp. v. Waters* (1978) 438 U.S. 567, at 578, 98 S.Ct. 2943, at 2950, 57 L.Ed.2d 957, and one way of proving pretext is "by showing that the employer's proffered explanation is unworthy of credence," *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105.

In this case, that means showing that NCR management was aware that with the CEs' workloads as heavy as they were, that CEs were unable to meet the artificial measuring sticks of SLA metrics.

The evidence sought is relevant to showing that the stated reasons for plaintiff's termination, "Unsatisfactory Performance", NCRPROD 00197, in particular failing to meet his SLA metrics, is not worthy of credence given the extraordinary workload plaintiff had to carry for the months preceding his firing in what were "difficult times" according to his superior. As such, the evidence sought is relevant to the claims or defenses in this action.

Given plaintiff's claim for punitive damages, evidence that NCR management was aware of the workloads but continued to use SLAs as a basis for firing employees, is therefor relevant to showing malice, and therefor relevant to the claim. "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible," *Philip Morris USA v. Williams* (2007) 549 U.S.346, at 355, 127 S. Ct. 1057, at 1064, 166 L. Ed. 2d 940.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

The request is overly broad and vague and ambiguous. The request is overly broad in that it seeks managerial awareness throughout NCR concerning workload information (which is undefined) and pertains to Customer Engineers throughout the entire U.S. Defendant asks that this request be narrowed substantially to the territory in which Plaintiff worked or be stricken in its entirety.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office. Put another way, an email by a territory manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

**REQUEST FOR PRODUCTION NO. 141 [as corrected by the 7/6/10 notice of errata]:**

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that was **sent to or from, or** circulated among NCR management that reflects NCR management awareness in 2008 of, and/or discussion of, the amount of overtime being worked by Customer Engineers in 2008.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 141:**
  Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**
  NCR's payroll records concerning plaintiff disclose he worked huge amounts of overtime; when plaintiff submitted his overtime hours to Territory Manager Erick Aguilar on August 25, 2008, three weeks before NCR fired plaintiff, Doubt included the complaint that he was suffering "burnout" from all the overtime, and that as of 2:52am that morning he was sleeping in his car to be  able to respond to a request for service in Oakland but the customer contact was not answering her phone.
  Plaintiff's complaint alleges separate claims for retaliatory discharge in response to complaints concerning (a) working conditions and (b) violations of law.
  The documents sought are relevant to the issue of NCR's knowledge of the amount of overtime plaintiff was being required to work, and to what extent Aguilar shared Doubt's complaints of the "burnout" from the amount of overtime NCR was requiring and Doubt's complaint concerning working conditions, having to sleep in his car at 2:52am while awaiting the customer's arrival at the worksite.
  The information sought is also relevant to the claims or defenses in this action because California *Labor Code* §510(a) requires employers to pay overtime for work in excess of eight  hours per day, or forty hours per week, and the extent to which NCR wished to avoid paying overtime, e.g., by firing those who had put in large amounts of ovetime, is relevant to the claim of discharge in violation of fundamental public policy, with one of the policies in question being the statutory requirement of paying overtime.
  The paper trail reflects that NCR has for years been concerned with overtime expense. From the October 13, 2005, memo from then Territory Manager John Harvey entitled "Urgent: New Overtime Rules" to the September 10, 2008 email from Northwest Field Operations Manager John Harvey entitled "Important: NW Overtime Approval Process effective immediately" both underscore NCR's concern with overtime expense.
  In March of 2008 NCR was hit with a class-action lawsuit alleging failure to pay overtime, *Teeter v. NCR*, which included plaintiff Terry Doubt as a class member, and which ultimately settled, with NCR paying plaintiff Doubt nearly three times the amount it paid the average class member.
  As NCR was aware of the claim made on plaintiff's behalf long before it fired him, and recognized that he was a class member on whose behalf a complaint of failure to pay overtime was being made, NCR's circulation among management of correspondence concerning the fact, or amount, of overtime being worked by Customer Engineers is relevant to the claims for wrongful discharge and punitive damages being made in this action.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

    The request is overly broad and vague and ambiguous.  The request is overly broad in that it seeks managerial awareness throughout NCR concerning workload information (which is undefined) and pertains to Customer Engineers throughout the entire U.S.  Defendant asks that this request be narrowed substantially to the territory in which Plaintiff worked or be stricken in its entirety.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

    If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office.  Put another way, an email by a territory  manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

**REQUEST FOR PRODUCTION NO. 142 [as corrected by the 7/6/10 notice of errata]:**

    Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual, that was **sent to or from, or** circulated among NCR management that reflects NCR management awareness in 2008 of the alleged unfairness of any management assessment of Customer Enginners' job performance, whether referring to a particular occasion on which an employee was criticized, or pursuant to NCR's practice of reviewing performance in an annual performance evaluation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 142:**

    Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, is unduly burdensome, and seeks irrelevant documents.  Defendant also objects that this request is vague and ambiguous as to the meaning of "piece of electronically stored information" and "reflects … awareness" and  "unfairness" and "criticized."

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

    Caselaw makes clear plaintiff must be allowed to show that the employer's proffered reason for the termination is untrue, "The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination, *Furnco Const. Corp. v. Waters* (1978) 438 U.S. 567, at 578, 98 S.Ct. 2943, at 2950, 57 L.Ed.2d 957, and one way of proving pretext is "by showing that the employer's proffered explanation is unworthy of credence," *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, at 143, 120 S.Ct. 2097,  147 L.Ed.2d 105.

In this case, that means showing that SLAs were such an unrealistic measure of CE performance that not only did a Territory Manager tell a CE to create a untrue on the spot service call record to boost the CE's SLAs, as is reflected by the November 13, 2007, Cheadle email, which is relevant to NCR's purported legitimate, non-discriminatory reason for firing plaintiff, but also that Senior NCR management was aware of this practice and continued to use SLAs as a basis for firing employees, which is therefor relevant to plaintiff's claim for punitive damages, i.e, showing malice, and therefor relevant to that claim in this action, "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible," *Philip Morris USA v. Williams* (2007) 549 U.S.346, at 355, 127 S. Ct. 1057, at 1064, 166 L. Ed. 2d 940.

## DEFENDANT'S ARGUMENT/COMPROMISE:

This request is overly broad and vague and ambiguous.  The request is overly broad in that it seeks managerial awareness throughout the U.S. on the ill-defined subject of "unfairness."  It is also overly broad and vague as to the assessment of Customer Engineers' job performance and criticism which may or may not have been issued.  The information sought is not relevant to the issues in this case, in that the request fails to address specific situations in which managers or supervisors of Plaintiff and or other similarly-situated individuals assessed the job performance of their subordinates.  Defendant asks that this request be narrowed substantially to the territory in which Plaintiff worked or be stricken in its entirety.

## PLAINTIFF'S REBUTTAL/COMPROMISE:

If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office.  Put another way, an email by a territory  manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

## REQUEST FOR PRODUCTION NO. 147:

Policy statement, guidelines, directions, NCR intra-net postings, or other instructions to any NCR employee on the subject of what was meant by the statement in the 7/3/08 email, sent on behalf of Chris Cheadle, that "NCR remains 100% committed to our goal or achieving equal treatment of all Customer Engineers across the U.S., "a copy of which was produced by plaintiff on March 29, 2010.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 147:

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly.  Defendant further objects to this request on the grounds it is overly broad, unduly burdensome, and seeks irrelevant documents.

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

When plaintiff was employed by AT&T before it sold the business unit in which plaintiff worked to NCR in 1991, plaintiff's employment was subject to a collective bargaining unit containing a requirement of "good cause" for discipline or termination.

As plaintiff's complaint is being amended to assert an implied in fact contract not to terminate except for good cause, discovery on what NCR meant when it told employees "NCR remains 100% committed to our goal or achieving equal treatment of all Customer Engineers across the U.S." in an email discussing NCR's negotiations with the Teamsters is relevant to the claims or defenses in this action, *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, at 344-345, 346.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

This request is overly broad in that it would capture any comment within NCR or a response to a legitimate commitment of NCR to treat all employees equally. Defendant has no objection to producing human resources policy statements concerning non-discrimination and equality in the workplace which would be relevant to the issues in this case. However, commentary or instructions to employees in areas other than Plaintiff's territory would clearly be irrelevant. Defendant asks that this request be narrowed substantially.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office. Put another way, an email by a territory manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

**REQUEST FOR PRODUCTION NO. 148:**

Each and every document, whether piece of electronically stored information, email, including attachments thereto, memorandum, text message, or piece of correspondence emanating from someone, rather than being part of a manual and directed to any NCR employee, concerning what was meant by the statement in the 7/3/08 email, sent on behalf of Chris Cheadle, that "NCR remains 100% committed to our goal of achieving equal treatment of all Customer Engineers across the U.S.," a copy of which was produced by plaintiff on March 29, 2010.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 148:**

Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending. Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator. Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is duplicative of Request No.147, is overly broad, is unduly burdensome, seeks irrelevant documents, and is vague and ambiguous as to the meaning of "piece of electronically stored information."

47

**PLAINTIFF'S ARGUMENT WHY THE INFORMATION IS RELEVANT TO THE CLAIMS OR DEFENSES:**

      This category does not duplicate category 147, which dealt with manuals or similar standardized documents available as a reference, while this category seeks documents containing instructions that would generally be characterized as correspondence, such as letters, emails, memos, or text messages, that would normally emanate from someone (even if automatically) rather than sit on a bookshelf or reside on a computer hard-drive as would a manual.

      When plaintiff was employed by AT&T before it sold the business unit in which plaintiff worked to NCR in 1991, plaintiff's employment was subject to a collective bargaining unit containing a requirement of "good cause" for discipline or termination.

      As plaintiff's complaint is being amended to assert an implied in fact contract not to terminate except for good cause, discovery on what NCR meant when it told employees "NCR remains 100% committed to our goal or achieving equal treatment of all Customer Engineers across the U.S." in an email discussing NCR's negotiations with the Teamsters is relevant to the claims or defenses in this action, *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, at 344-345, 346.

**DEFENDANT'S ARGUMENT/COMPROMISE:**

      This request is overly broad in that it would capture any comment within NCR or a response to a legitimate commitment of NCR to treat all employees equally.  Defendant has no objection to producing human resources policy statements concerning non-discrimination and equality in the workplace which would be relevant to the issues in this case.  However, commentary or instructions to employees in areas other than Plaintiff's territory would clearly be irrelevant.  Defendant asks that this request be narrowed substantially.

**PLAINTIFF'S REBUTTAL/COMPROMISE:**

      If the Court were inclined to limit the scope, plaintiff submits that it should include correspondence going up the chain of command from plaintiff's supervisor, Territory Manager Erick Aguilar through and including the corporate office, i.e., all vertical communications through and including the corporate office.  Put another way, an email by a territory  manager in another state, sent to his supervisor who was not in the corporate office, would be excluded from the scope of documents to be produced, i.e., horizontal communications would be excluded.

      B.     When defendant will produce the documents not subject to dispute.

      As reflected by the October 8th Young email, after the October 7th meeting of counsel, relatively few categories of documents remain in dispute.  Defendant agreed to produce documents responsive to categories 1-5, 10-34, 39-88, 92-127, 135-136, 143-146, and 149-152.

      What was left unresolved, and requires the Court's intervention, is *when* defendant will produce documents responsive to categories 1-5, 10-34, 39-88, 92-127, 135-136, 143-146, and 149-152.

      Plaintiff contends that defendant should be ordered to produce the documents forthwith as the request was propounded July 2nd, and defendant has known since September 13th that this case would not be ordered into arbitration.

      Defendant will produce the documents not subject to dispute by December 6, 2010.

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ARGUMENTS TO COMPEL DISCOVERY

### I

### PLAINTIFF'S CONTENTIONS CONCERNING HIS CLAIMS FOR RELIEF AND SUPPORTING AUTHORITY

Plaintiff's first amended complaint  alleges claims for wrongful discharge in violation of public policy, with the policies in question being

age discrimination forbidden by *Government Code* §12940(a).

Plaintiff amended his complaint to add statutory claim for age discrimination based upon FEHA, California *Government Code* §§12940, 12941, and common law claims for breach of implied contract to terminate only for cause and breach of the implied covenant of good faith and fair dealing.

In his common-law and statutory claims plaintiff alleges both "disparate impact" under *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and "disparate treatment" under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Plaintiff also alleges retaliatory discharge in violation of fundamental public policy in response to complaints concerning working conditions, and violations of law.

A.    Disparate impact / Direct proof of discriminatory motive.

Plaintiff alleges that NCR chose to weed out high earning Customer Engineers, which included plaintiff.  In California, "the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers as a group, and further declares its intent that the disparate impact theory of proof may be used in claims of age discrimination," *Government Code* §12941.

Direct proof of discrimination, without reliance upon the *McDonnell Douglas* presumption, is particularly potent because "[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination," *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985); see also *Bell v. Birmingham Linen Service* (11th Cir., 1983) 715 F.2d 1552, at 1556.  See also *Hill v. Metropolitan Atlanta R.T.A.* (11th Cir., 1988) 841 F.2d 1533, at 1539, *Jardien v. Winston Network, Inc.* (7th Cir., 1989) 888 F.2d 1151, at 1153, *Gray v. University of Arkansas* (1988) 883 F. 2d 1394, at 1398, citing *Hill*, supra, *Shager v. Upjohn Co.* (7th Cir., 1990) 913 F.2d 398, at 402.

As caselaw has recognized,

> **[W]here a case for discrimination is proved by direct evidence it is incorrect to rely on a McDonnell Douglas form of rebuttal**. . .Where the evidence for a prima facie case consists, as it does here, of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference is required.  **Defendant cannot rebut this type of showing of discrimination simply by articulating or producing evidence of legitimate, nondiscriminatory reasons**.

*Lee v. Russell County Board of Education* (11th Cir.1982) 684 F.2d 769, 774.

      B.     <u>Disparate treatment</u>.

Plaintiff may prove disparate treatment of older employees in different ways.

First of all, plaintiff may show that NCR retained younger employees who were similarly situated to older employees who had been fired.  Erick Aguilar's 4/30/08 YTD tally of his workgroup's SLAs (which he distributed by email dated 5/29/08) reflects that several employees had not met their SLA targets, among them Terry Doubt, Michael Knapp, Hieu Nguyen, Dante Banez, Mark Paulley, Gilbert Latorre, Ernesto Mendoza and Kenny Cheng.

However, the table produced by NCR, labeled NCRPROD 00197, shows that from early 2008 through mid 2009 the only employees fired for "unsatisfactory performance" were all over 50 when fired, Terry Doubt, Michael Knapp, Hieu Nguyen, and Julio Medina, while Mark Paulley, Gilbert Latorre, Ernesto Mendoza and Kenny Cheng, were all under 40, and as of whatever date NCR's tally was prepared, they were "still active" with the company.

This is comparative evidence, and is a variation on the formula articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; those in the protected class, all over 40 (actually, all were over 50) were treated differently than significantly younger employees outside the protected class, despite all being similarly situated, purportedly not meeting the prescribed SLA targets.

As the ninth circuit has noted, "Evidence that one or more similarly situated individuals outside of the protected class received more favorable treatment can constitute sufficient evidence of discrimination for a Title VII plaintiff to prevail," *Beck v. United Food and Commercial Workers Union, Local 99* (9th Cir., 2007) 506 F.3d 874, at 883.

However, the Supreme Court has recognized other bases for the plaintiff to carry his burden of showing a discriminatory intent.  As the Supreme Court has noted,  "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence," *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), quoted by *Desert Palace, Inc. v. Costa* (2003) 539 U.S. 90, at 100, 123 S.Ct. 2148, at 2154, 156 L.Ed.2d 84.

In addition to comparative evidence, statistics concerning others in the protected class can be relevant in a discrimination case on the issue of motivation

> Thus, although we agree with the Court of Appeals that in this case such proof neither was nor could have been sufficient to *conclusively* demonstrate that Furnco's actions were not discriminatorily motivated, the District Court was entitled to *consider* the racial mix of the work force when trying to make the determination as to motivation. The Court of Appeals should likewise give similar consideration to the proffered statistical proof in any further proceedings in this case.  [italics in original]

*Furnco Const. Corp. v. Waters*, 438 U.S. 567, at 580, 98 S.Ct. 2943, at 2951, 57 L.Ed.2d 957 (1978).

As the ninth circuit has noted,

> Statistical data is relevant because it can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices. Such a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue.

*Lowe v. City of Monrovia* (9th Cir., 1986) 775 F.2d 998, at 1008, quoting from *Diaz v. American Tel. & Tel.,* 752 F.2d 1356, at 1362.

Moreover, in addition to comparative or statistical evidence, a plaintiff may make out a *prima facie* case by showing a pattern or practice of discriminatory treatment.  As the high court noted in *International Broth. of Teamsters v. U.S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977),

> The *Franks* case thus illustrates another means by which a Title VII plaintiff's initial burden of proof can be met. The class there alleged a broad-based policy of employment discrimination; upon proof of that allegation there were reasonable grounds to infer that individual hiring decisions were made in pursuit of the discriminatory policy and to require the employer to come forth with evidence dispelling that inference.

at 359, referring to *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).  As the Court noted,

> The holding in Franks that proof of a discriminatory pattern and practice creates a rebuttable presumption in favor of individual relief is consistent with the manner in which presumptions are created generally. Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof.

Ibid., at ft#45.

51

Here, plaintiff's comparative evidence of NCR's treatment of those over 50 being fired (Terry Doubt, Michael Knapp, Hieu Nguyen, and Julio Medina) while those significantly younger (and under 40) being retained (Mark Paulley, Gilbert Latorre, Ernesto Mendoza and Kenny Cheng), when all of them had failed to meet their SLA targets as of April 30, 2008, is sufficient under *McDonnell-Douglas* to create the presumption of discrimination.

Plaintiff is also entitled to show that NCR's purported reason for firing plaintiff - failing to meet SLA targets - is mere pretext. As the Supreme Court has repeatedly held, "The plaintiff must be given the opportunity to introduce evidence that the proffered justification is merely a pretext for discrimination, *Furnco Const. Corp. v. Waters* (1978) 438 U.S. 567, at 578, 98 S.Ct. 2943, at 2950, 57 L.Ed.2d 957.

As the Supreme Court said in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the employee can demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence,"450 U.S. at 256, 101 S.Ct. at 1089. "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Davis v. Chevron, U.S.A., Inc.,* 14 F.3d 1082, 1085 (5th Cir.1994) (alterations in original, quotations and citations omitted).

Direct evidence of discriminatory intent in a gender discrimination claim would be a statement that the female employee was not promoted because the manager " 'did not want to deal with another female after having dealt with ... Louise De PreFontaine'." *Godwin v. Hunt Wesson, Inc.* (9th Cir., 1998) 150 F.3d 1217, at 1221.

Pretext may be shown circumstantially by comparative evidence, i.e., how the employer treated those who were significantly younger than plaintiff, "Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class," *O'Connor, v. Consolidated Coin Caterers Corp.* (1996) 511 U.S. 308, at 313, 116 S.Ct. 1307, at 1310, 134 L.Ed.2d 433, or by statistics *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, at at 804-805, 93 S.Ct. 1817, 36 L.Ed.2d 668, or "by showing that the employer's proffered explanation is unworthy of credence," *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, at 143, 120 S.Ct. 2097, 147 L.Ed.2d 105. The Court emphasized that particularly pertinent for the fact-finder would be the employee showing that the proffered reason for the termination was false:

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. ([P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the

general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.

*Reeves*, 530 U.S. at 147, 120 S. Ct. at 2108 [internal quotations and citations omitted], citing *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992).

Moreover, " The trier of fact may consider the same evidence that the plaintiff has introduced to establish a *prima facie* case in determining whether the defendant's explanation for the employment decision is pretextual," *Lowe v. City of Monrovia* (9th Cir., 1986) 775 F.2d 998, at 1008.  And once plaintiff has made the prima facie case, then shown the falsity of the employer's explanation, the trier of fact may then find discrimination, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," *Reeves*, 530 U.S. at 147, 120 S. Ct. at 2108 [emphasis in original].

C.      Retaliatory discharge.

Plaintiff contends that motivating reason for NCR firing him was in response to the class action alleging NCR's overtime law violations, and plaintiff's own complaints of having to work ridiculous amounts of overtime and the crushing workload.  See plaintiff's email to Aguilar of August 25, 2008 complaining of "overtime burnout" and plaintiff's comment of having to sleep in his car in Oakland at 2am while awaiting word from the customer.

*Labor Code* §510 imposes the obligation upon the employer to pay premium for time spent over eight hours per day or 40 hours per week.

Liability for firing an employee in response to complaints concerning working conditions requires few citations, see *Labor Code* §§232.5, 6300 et seq., *Lujan v. Minagar* (2004) 124 Cal.App.4th 1040.

D.      Punitive damages.

Plaintiff alleges a claim for punitive damages and an employee's status as a managing agent is relevant to that issue, *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, CACI 3946 ("An employee is a 'managing agent' if he or she exercises substantial independent authority and judgment in his or her corporate decision making so that his or her decisions ultimately determine corporate policy."  NCR's answer asserts as a first affirmative defense that the complaint fails to state facts sufficient to constitute a claim, and the sixth affirmative defense asserts that California *Civil Code* §3294 bars any punitive damage award.

As that section provides in sub-division (b) that corporations can only be held liable for punitive damages based upon the acts or omissions of an "officer, director, or managing agent of the corporation", documents reflecting the titles and duties of various individuals is relevant to the claim for punitive damages and NCR's sixth affirmative defense.

II
## PLAINTIFF'S CONTENTIONS AS TO WHAT THE
## EVIDENCE ALREADY IN HAND SHOWS

A.    <u>NCR's short staffing, hostility to overtime and cost-cutting in 2008</u>.

In 2001 plaintiff was chided by Douglas Fear, NCR's "Regional Technical Specialist", for having submitted three hours of overtime for doing paperwork on Sunday (tab A, 02/12/01 Fear email re:  Unauthorize OT for Sunday 02-11-2001).

In July of 2001 a memo went out reflecting NCR's concern over the cost of having long-term employees with high hourly rates doing the routine repair work, "Many of our U.S. customer engineers have 20 years or more NCR experience. Utilizing such highly skilled professionals for lower-end repair work is neither productive nor most cost-effective" (tab B, 07/06/01 Henderson email re_cost-effcv of older CEs).

In October of 2005 plaintiff's then supervisor, John Harvey (Erick Aguilar's predecessor) sent an email to the team confirming the restrictive rules concerning overtime that had been the subject of a conference call with his subordinates, "New overtime rules as we discussed on our conference call. These rules take effect immediately .."  (tab H, 10-13-05 Harvey email re_OT approval needed).

In what was no small coincidence, in late summer of 2008, just before NCR fired plaintiff, overtime again became a hot topic, resulting in another edict restricting overtime, "In an effort to better manage our overtime spend and meet or beat the targets set, we will be implementing the following overtime approval process effective immediately" (tab MM, 09/10/08 Aguilar email forwarding email FW Important NW Overtime Approval Process effective immediately, that had been sent by John Harvey, then Field Operations Director for the Northwest Region).

Keeping the teams understaffed, and thereby requiring that overtime would have to be worked, had been a source of grousing among NCR's employees for years.  NCR had a forum for employees to voice concerns, and in October of 2005 one employee had complained bitterly of the chronic understaffing that required substantial overtime:

> I am tired of working sixty to ninety hour weeks, while management continues to talk of trimming more people. I do hope and pray that soon, it will become a requirement for Dayton desk jockeys to spend two weeks down here in the trenches with the rest of us.

Tab I, 10-29-05 Niehoff posting re_NCR culture.

In January of 2008 VP Chris Cheadle acknowledged that cost-cutting was creating dissension in the ranks:

54

You will remember from the webcast, ACS has experienced flat profit performance over the past five years and no revenue growth. This has driven the significant cost reductions that have been essential to keeping our business viable. When there is no revenue growth – the only way to survive is through cost-cutting. I know the organization is tired of cost-cutting; it is hard and unpopular.

Tab P, 01/21/08 Cheadle Very Important Message Regarding Americas CS Organization Changes.

It is against this background that plaintiff's termination took place.

B.  Plaintiff's performance.

For calendar 2000 NCR gave plaintiff a glowing performance review, noting that his performance in three areas was "Exceptional", in others "Satisfactory," there were *no* areas in which plaintiff "needs improvement" (tab C, undated (2001?) Morales, Pursell evaluation by NCR 2000_Doubt). Plaintiff's performance "earned" him a cash bonus (tab D, 03/05/01 Gagliardi 2000 employee incentive plan award).

For calendar 2001 plaintiff's performance was "Exceptional" in six areas, with two "Satisfactory" and nothing needing improvement (tab E, undated (2002?) Morales, Pursell evaluation by NCR 2001_Doubt). Plaintiff once again "earned" a bonus for 2001 (tab F, 03/03/02 Gagliardi 2001 Business Performance Plan bonus calculation).

For calendar 2002 plaintiff's performance improved once again, with seven areas being "Exceptional", and one "Satisfactory", and nothing needing improvement (tab G, undated (2003?) Morales, Pursell evaluation by NCR 2002_Doubt).

For reasons unknown, NCR cannot produce the evaluations for years 2003, 2004, or 2005 when John Harvey was plaintiff's supervisor. Plaintiff recalls that the evaluations were so negative that he wrote rebuttals to each on them, but they are not in plaintiff's personnel file as produced by NCR as part of its initial disclosure under FRCP Rule 26.

Once Harvey was promoted, and Erick Aguilar became the Territory Manager and plaintiff's supervisor, the evaluations were also inaccurate and negative, but belied by NCR's recognition of plaintiff's performance as it awarded plaintiff cash bonuses for his work despite the negative evaluations.

On March 27, 2007, Aguilar and his superior, John Foote, claimed in the evaluation for calendar 2006 that nothing about Doubt's performance was "Exceptional", only three were "Satisfactory", and two "Needs Improvement" (tab K, 03/27/07 Aguilar, Foote Evaluation by NCR on Doubt).

However, on February 26, 2007, NCR had given plaintiff a bonus under its new plan, stating "You have earned a 2006 Business Performance Plan (BPP) award payment based on

actual performance against business objectives" (tab J, 02/26/07 email from Compensation re: Confidential - 2006 Business Performance Plan (BPP) Bonus).

Later in 2007 NCR generated, *but never gave to plaintiff*, two Performance Improvement Plan (PIP) memos purporting to criticize him for failing to meet performance criteria during 2007 (tab L, 09/25/07 PIP write-up, and tab M, 10/27/07 PIP write-up). Aguilar and Foote rated plaintiff more negatively for calendar 2007 than they had for 2006, they claimed that in 2007 plaintiff's performance was "Satisfactory" in only two areas, and "Needs Improvement" in three, with nothing "Exceptional" (tab EE, 04/30/08 Aguilar, Foote evaluation of Doubt).

Once again, the absurdity of the criticisms in both the PIP write-ups and the evaluation was reflected by NCR awarding plaintiff a bonus in early 2008 *of almost $2,000 for his performance during 2007*, "**You have earned a 2007 Business Performance Plan (BPP) award payment based on actual performance** against business objectives." (tab R, 03/07/08 email from Compensation Confidential, and tab S, check detail for pay period ending 3/8/08).

C.     <u>Management's use of PIP write-ups as a pretext for firing</u>.

NCR management relies upon three "SLAs", and the number of calls closed per day, to measure performance.

First Visit Resolution (FVR) measures how many (i.e., what percentage) of the visits by the CE result in the repair on that first visit, i.e., without having to return to the site for whatever reason.

SLA Response measures how often the CE arrives at the customer's location after receiving the request for service within the time specified in NCR's contract.

SLA Resolution measures how often after arriving the CE fixes the problem within the time window called for by NCR's contract with the customer.

Closed calls per day measures how many service calls per day are completely closed, i.e., without the CE having to return on another day to do something.

These can be such artificial measures, and so difficult to meet even when a CE was performing at his or her best, that some supervisors would tell the CEs to lie to meet their numbers by claiming that once the CE had arrived at a customer in response to a phone call requesting service, the particular customer had given the CE additional work to do that had not been called in to NCR, which was known as a "hand held terminal" (HHT), and NCR senior management had actual knowledge of this practice nearly a year before plaintiff was fired:

During Chris Wallace's Town Hall webcast earlier this month, a concern was raised that some Customer Engineers were being told by local management to generate HHT (hand held terminal) calls in order to improve SLAs.  I commend the CE who voiced his concern.  While the intent of the request was not to

improve SLAs, it is easy to see how the request could have been interpreted this way.  This incident reinforces the need for each of us to communicate clearly and question that which does not seem right or make sense to us.

Tab N, 11/13/07 Cheadle email re:  Importance of Data Integrity in our business.

> D.    Events in 2008.

By late February Michael Sweeney had been fired but not replaced, leaving the 750B team understaffed to cover the sprawling service area of San Benito, Monterey and Santa Cruz counties (tab Q, 02/26/08 Aguilar email and its attachment, 02-26-08 750B Roster).

In late March there was a "directive" by NCR management to use the PIP write-ups as justification for terminating employees "we need to push for a Apr.1st PIP date" (tab T, 3/24/2008 Michalek email to Foote re:  Hoyle directive re_2007 PIPs).

In what is particularly telling, when Foote responded to Michalek on March 26th, he asked for the details of the payroll expense NCR had incurred for plaintiff, Vassar and Knapp "Could you please pull the YTD records for Alex Vasser, Terry Doubt and Mike Knapp so I can see their regular, vacation, sick, overtime and double time hours?" (tab U, 03-26-08 - 03-28-08 Foote_Michalek_Scahugnn_Harvey email string).

PIP write-ups were prepared for Michael Knapp and plaintiff (tab V & W), and given to them by Aguilar, who then shared with management Knapp's reaction, "Fire me, I don't give a shit" but said nothing negative about plaintiff's (tab X, 04/02/08 Aguilar email re_giving PIPs to Doubt & Knapp).

A week later a fourth man, Hieu Nguyen, was added to the 750B team, though he was in training and not in the field for a time after being hired (tab Y, 4-07-08 - 4-13-08 schedule spreadsheet), and the first week he was purportedly[1] assigned to the field, team member Alex Vassar went out on a medical leave that lasted until September 3rd for surgery on a heart valve (tab Z, 04-14-08 - 04-20-08 schedule spreadsheet, and tab KK, 08-25-08 to 8-31-08 schedule spreadsheet).

When Nguyen was in the field, he was nonetheless still in training, with plaintiff mentoring him for several months, which drastically affected plaintiff's efficiency, and his SLAs.  Aguilar recognized how much extra work plaintiff had to do while training Nguyen on August 20th when Aguilar gave plaintiff "points", NCR's method of acknowledging employee contributions above and beyond the call:

---

[1] Nguyen was unavailable for field work until mid May as later management correspondence states.

> Congratulations! Erick Aguilar has awarded you points in the WCS Advantage rewards program.
> Reason: Assisting a co-worker
>
> Points: 300
>
> Comments: **Terry, thanks for all the extra work to support the Monterey area during this difficult times**.

Tab JJ, 08/20/08 Aguilar email to Doubt, "You've Got Points!"

Compounding the CE's ability to meet the SLA targets was NCR's insistence on taking care of certain customers even when it may have been more efficient for the CE to respond to a closer call instead of the preferred customer, "Here is a list of critical customers requiring priority" (tab AA, 04/17/08 Aguilar email Critical accounts).

Management was supposed to meet with whoever was on PIP on a weekly basis, document what happened at the meeting, and share the documentation with HR, "I need to receive copies of the comments of the weekly sessions of all the PIPs via email." (Tab BB, 04/17/08 Michalek email re_Knapp voicemail & weekly sessions). In response Harvey asked to have Knapp's PIP extended from 30 to 60 days, with HR's response being "We do not have the support for another 30 days, perhaps 2 weeks. **We are getting a lot of pressure to exit the double NI's**," (tab FF, 04-18-08 - 05-01-08 Hrvy_Mchlk_Ft email string re_'pressure').

Despite plaintiff ostensibly being given 60 days in which to improve his performance after being put on PIP on April 1st, the "marching orders" from upper management were to get those on PIP off the payroll and as of April 29th the plan was to fire Doubt on June 4th (tab CC, 04/28/08 Rennick email string-firing Doubt 6-4).

At this point, late April, the 750B team had not four members, but only two, with Vasser out on medical leave, and the new-hire, Nguyen, not even in the field but instead in training (tab DD, 04-21-08 - 4-27-08 schedule spreadsheet).

During the second week of May management realized it would have no experienced CEs at all if it fired both Doubt and Knapp, as Nguyen had not even really started work, but had been in training for the previous several weeks. As Foote noted in a May 12th email at 5:37pm:

> This plan is somewhat shaking as it depends on a person coming back from disability and providing additional training to a new CE that has been In training for the last 6 weeks on retail and ATM. My concern is we are putting too many eggs in one basket **as Hieu hasn't spent any time working since he was trained**.

Tab GG, 05-12-08 - 05-13-08 Schagunn_Foote_Battleson_Foote_Schagunn_Aguilar email string re_exit dates.

At the end of May Aguilar shared with the 750B team that through April 30th the vast majority of the team had failed to meet SLA targets (tab HH, 05/29/08 Aguilar email SLAs YTD results through 4/30/08, and tab II, the attachment, 5/29/08 YTD as of 04-30-08 CE_750B spreadsheet).

Throughout the summer,  Doubt worked prodigious amounts of overtime to meet the customers' needs, all the while training Nguyen in the field as well.

As noted above, in mid-August NCR recognized that plaintiff was practically killing himself with work, "Terry, thanks for all the extra work to support the Monterey area during this difficult times," (tab JJ, 08/20/08 Aguilar email "You've Got Points!").

This doubtless increased his visibility as a significant overtime expense, which as noted above, was an expense NCR was loathe to bear as the summer ended (tab MM, Harvey's 09/10/08 email Important NW Overtime Approval Process effective immediately).

   E.    Despite evidence of widespread failure of CEs to meet SLAs in 2008, according to NCR's own paperwork only those over 50, including plaintiff, were fired.

In Aguilar's September 5, 2008 email to the 750B team, he pointed out that the eight other teams in the territory had failed to meet the SLA targets (tab LL, 09/05/08 Aguilar email re:  August Territory Summary, and 09/05/08 August Territory Summary spreadsheet).

However, as NCR's own tally reflects, the only people fired from June 27, 2008 through April 17, 2009, were Terry Doubt, Michael Knapp, Julio Medina and Hieu Nguyen, which the tally shows were all over 50 (tab NN, undated NCR list of firings in plaintiff's workgroup 06-27-08 - 04-17-09); Michael Sweeney, who was a member of the Monterey team as of January 2008 (tab O, 01-14-08 - 01-20-08 schedule spreadsheet) but whose name does not appear in NCR's tally, was also over 50.

It is against this backdrop that plaintiff sought to follow up on the documents cited above with the demand for documents to which NCR has objected.

III
**WHAT PLAINTIFF'S DISCOVERY SOUGHT**

Plaintiff's first document demand, in the main, sought discovery on the following:

●    NCR policies and practices concerning evaluating, criticizing or rewarding employee performance;

●    The duties of NCR's Customer Engineers (such as plaintiff), and the criteria by which NCR measured or assessed their job performance;

- Plaintiff's workload in the months before his termination, in particular the absence of a full complement of Customer Engineers in the Monterey Team workgroup and how that affected plaintiff's ability to comply with the "metrics" by which Customer Engineers' job performance was measured

- NCR's cost-cutting program in general, and concern with salary expense in particular;

- NCR's directive from Human Resources in the spring of 2008 to terminate employees whose "metrics" did not meet certain standards;

- NCR's liability to Terry Doubt for overtime in the Teeter v. NCR class action matter, and the extent to which that liability was considered by any of the decision makers responsible for plaintiff being fired;

- NCR knowledge of employee complaints concerning the working conditions, the amount of overtime required of Customer Engineers, and the unfairness and inaccuracy of blind reliance upon the "metrics" to measure or assess job performance.

- Whether plaintiff was an at-will employee, or was subject to a requirement of good cause to terminate his employment.

Moreover, some categories sought information that would lay foundations for the admission of certain pieces of evidence, for example, the particulars of an individual's duties are relevant to issues of admissibility of the individual's statements in the face of a hearsay objection as those duties may supply the basis for the admission of the statements as non-hearsay under FRE Rule 801(d)(2)(C), (D) or (E), see *Mahlandt v. Wild Canid Survival & Research Center, Inc.* (1978) 588 F.2d 626, at 630.

Finally, evidence of conduct that may not form the basis of liability, for example because the acts themselves were outside the limitations period, is nonetheless admissible for other purposes, such as motive and context, "Nesbitt may use these time barred acts, however, as evidence to establish motive and to put his timely-filed claims in context", *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara* (2003) 344 F.3d 822, at 829.

As the Supreme Court has recognized, conduct outside the limitations period can be relevant because " It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue" *United Air Lines, Inc. v. Evans* (1977) 431 U.S. 553, at 558, 97 S.Ct. 1885, at 1889, 52 L. Ed.2d 571.

In sum, plaintiff's discovery was designed to ferret out information relevant to supporting plaintiff's claims, and disproving NCR's stated reason for firing plaintiff - "unsatisfactory performance" (NCRPROD 00197).

In response, NCR has interposed specious objections that will result in sanctions.

60

IV

**NCR'S OBJECTIONS ARE SANCTIONABLE**

NCR's response to plaintiff's demand for documents violates both the letter and spirit of the applicable provisions of the FRCP.

Concerning discovery responses, Rule 26 states "By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" that objections are "not interposed for any improper purpose, such as to harass, cause unnecessary delay" Rule 26(g)(1)(B)(ii).  We will discuss below how the individual categories are relevant to the claims or defenses.

Plaintiff will not bother to address the facially specious objections that certain language is vague or ambiguous, such as was asserted in response to category 1, "vague and ambiguous as to the meaning of 'table or chart, similar to that produced by NCR as NCRPROD 00197,' " or category 2, "vague and ambiguous as to the meaning of 'piece of electronically stored information,' 'other writing,' and 'behaved.' "  Feigning an inability to understand simple English is an evasive response sanctionable under Rule 37(a)(4); caselaw has held that a party responding to discovery may not feign ignorance of the meaning of a question just to avoid answering it:

> A party may not deliberately misconstrue a question for the purpose of supplying an evasive answer.  [Citation]  Indeed, where the question is somewhat ambiguous, but the nature of the information sought is apparent, the proper solution is to provide an appropriate response. [Citation.]

*Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, at 783, 149 Cal.Rptr. 499, at 509.

Equally inappropriate was the objection based upon the pending motion to compel arbitration, particularly in light of *Fitz v. NCR* which held the same arbitration provision unenforceable under California law.  The objection was for the sole purpose of delay, expressly forbidden by Rule 26(g)(1)(B)(ii).

Similarly, the objection of privacy is specious and was interposed for the transparent purpose of delay as plaintiff has stipulated to a protective order.  As part of NCR's initial disclosure of documents it contends supports its defenses NCR produced documents stamped as confidential concerning third parties; some of those documents appear to have come from the personnel files of plaintiff's co-workers.  In fairness, NCR cannot have it both ways by invoking those privacy rights to shield from disclosure documents that plaintiff seeks.  NCR is free to designate the documents sought as confidential, but it must disclose them; in light of plaintiff having stipulated to a protective order and NCR's use of documents from plaintiff's co-workers' personnel files.

Finally, objections to the form in which the documents are to be produced are contrary to the express terms of Rule 34.

Rule 34(b)(1)(C) provides that a request for documents "may specify the form or forms in which electronically stored information is to be produced," and 34(b)(2)(E)(i) provides that "a party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request."  If the requesting party specifies the form of electronically stored information, the responding party must produce them in that format, *Conveo Corp. Southern Graphic Systems* (D. Minn., 2009) 2009 WL 4042898.

Even if the responding party objects to the particular form of ESI being requested, the response must state which form the responding party will produce the information, " If the responding party objects to a requested form — or if no form was specified in the request — the party must state the form or forms it intends to use," FRCP Rule 34(b)(2)(D).

In each category  in which NCR objects to the form of the ESI as requested by plaintiff, NCR's response fails to state in whatever format the documents will be produced as is required by the explicit language of the rule.

NCR's responses also fail to identify the sources containing potentially responsive information that NCR refused to search or produce.  As noted by a treatise with which you must be familiar:

> **Matters not produced must be identified:** The responding party must identify, by category or type, the sources containing potentially responsive information that it is neither searching nor producing. Enough detail should be provided to enable the requesting party to evaluate the burdens and costs of providing the discovery and the likelihood of finding responsive information on the identified sources.

*Federal Civil Procedure Before Trial* (TRG, 2010) ¶11:1854.5, citing the Advisory Committee's Note to 2006 Amendment to FRCP 26(b)(2).

### DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF ARGUMENTS TO LIMIT DISCOVERY

Defendant declines to address the merits of the case in this letter, as the Court's Revised Standing Order merely requests the parties to provide a joint letter to the Court including "a description of every issue in dispute and, with respect to each such issue, a detailed summary of each party's final substantive position and their final proposed compromise on each issue. Upon receipt of the Joint Letter the Court will determine what future proceedings are necessary." According to these instructions, Defendant has provided its position and proposed compromise on each discovery request in dispute.

Defendant maintains Plaintiff is not entitled to discovery sanctions because Defendant's objections to Plaintiff's discovery requests were proper.  A party from whom Rule 34 discovery is sought may move for a protective order under Rule 26(c) or a responding party may elect simply to interpose an objection. Moore's Federal Practice Civil, Volume 7, § 34.13 (2010). Discovery sanctions are only available in two situations: (1) when a party completely fails to answer or object to discovery requests and (2) when a party fails to comply with a court order. Here, neither situation is the case.

Defendant maintains Plaintiff is not entitled to the fees associated with preparing his meet and confer letter because Defendant's responses to plaintiff's discovery requests were substantially justified.  A legal position is "substantially justified" if there is a genuine dispute as to the proper resolution or if a reasonable person could think it correct.  In other words, a position is "substantially justified" if it has a reasonable basis in law and fact.  The substantial justification standard is met when a party demonstrates that the dispute about the matter was "genuine," meaning that reasonable lawyers could disagree about the appropriateness of the disputed position.  The substantial justification standard is objective. The source of the norms for determining whether the standard has been satisfied is the courts' view about the range of behavior that a hypothetical reasonable lawyer would engage in if confronted with the circumstances presented in the particular case.

Here, Defendant was substantially justified in objecting to Plaintiff's discovery requests as premature.  Defendant contended the parties entered into an arbitration agreement in 2002. The arbitration agreement did not allow for written discovery requests, absent permission from the arbitrator.  Until the Court ruled on Defendant's Motion, it was inappropriate for Defendant to provide substantive responses to Plaintiff's written discovery requests.  If Defendant provided substantive responses and then the Court granted Defendant's Motion, Defendant would have violated the arbitration agreement by giving Plaintiff more discovery than he was allowed. Defendant's position on this issue was reasonable and should not have been a surprise. Defendant advised Plaintiff of Defendant's position several times in person, in correspondence, and in two joint case management statements.  Defendant also explained that if the Court denied Defendant's Motion, Defendant would provide substantive responses.

Defendant apologizes for its delay in providing substantive responses. John Cowden's departure in early September was unexpected. Defendant appreciated Plaintiff's courtesy in allowing Patrick Mullin time to learn the case and respond to Plaintiff's concerns regarding discovery. On October 7, 2010, the parties met in person to confer about Plaintiff's discovery requests. During this meeting, Defendant agreed that NCR would produce all non-privileged documents responsive to Plaintiff's Requests for Production, with the exception of Request for Production Nos. 6, 8, 9, 35-38, 89-91, 128-134, 137-142, 147, and 148, about which defense counsel needed to consult with NCR. Defendant also told Plaintiff that Defendant would provide substantive responses to Plaintiff's Requests for Admissions. Defendant has conducted a preliminary investigation as to the location and availability of some, but not all, of the documents requested. It requests that it be allowed thirty (30) days to respond to the document requests on the basis that many of the individuals who might know of the location of responsive documents are no longer employed. Defendant's position regarding each request for production and admission is explained in more detail above.

Regarding electronically stored information, Plaintiff has proposed that unless a particular category of documents specifies the format in which the documents or pieces of electronically stored information are to be produced, they are to be produced either (1) in hardcopy, or (2) electronically in (a) rich text format (.rtf), or (b) MS Word format (.doc, not .docx), or (c) Excel (.xls, not .xlsx) format, or (d) PDF (.pdf) format, at the option of NCR. If the principal document is produced electronically, any attachments are to be produced in whatever electronic format in which they were sent or circulated electronically. If any documents are in color, or have shades of grey, they are to be produced electronically in whatever format preserves the colors or shading in the original; if any document is black and white only it may be produced in whatever format NCR selects, including hardcopy rather than electronically.

Defendant has learned that Plaintiff's computer was "wiped clean" before he returned it to IT after his termination. Two witnesses are available to testify to this fact. This is significant in that Plaintiff was aware of the Company's document retention policy of 30 days. The inference to be drawn is that he destroyed key evidence, which may be otherwise unavailable to NCR.

Defendant's Forensics/e-Discovery Manager is developing additional information in response to the categories of documents requested by Plaintiff in order to determine (1) availability and location of information, (2) volume of electronically stored information, (3) projected cost of production of electronically stored information, and (4) the burden on the organization in making such information available. Defendant anticipates that it will be able to identify the volume and scope of possible production within the next ten (10) days, and that subsequently it will engage in a meet and confer process with Plaintiff's counsel.

Plaintiff has also requested that all documents be produced both in hardcopy and in electronic format. This request is duplicative and will result in the parties incurring unnecessary expense in producing documents. Defendant therefore objects and requests that electronic

discovery be produced in a stipulated format convenient for the use of the parties in this litigation.

2.      Plaintiff's efforts to schedule depositions of (a) NCR's "person most knowledgeable ("PMK") under Rule 30(b)(6), and (b) percipient witnesses, and the locations of those depositions.

This Court's local rules require the parties to meet and confer concerning dates for depositions before serving notice.  Counsel did so, and had agreed on dates:

*The parties have reserved the week of November 1, 2010 for a deposition of defendant under FRCP Rule 30(b )(6). As yet, this deposition has not been formally noticed. The parties have also reserved the week of December 13, 2010 for percipient witness depositions of various individuals in Atlanta, and possibly New York City and Chicago.*

September 3, 2010, joint case management report," p. 7, lines 3-7.

When the parties met on October 7th, current lead trial counsel Patrick Mullin advised that the dates given by his predecessor, John Cowden, would no longer work.

Plaintiff contends that former NCR lead trial counsel John Cowden's departure does not excuse NCR or its current lead trial counsel from providing dates, particularly as plaintiff's counsel needs to advise the Second District Court of Appeal, Division 7, of dates plaintiff's counsel will not be available for oral argument in a case in which briefing was completed on October 25th, *Fotheringham v. Avery Dennison Corporation*, B217757.

Defendant NCR maintains that while Defendant is willing to meet and confer regarding deposition dates, Defendant cannot meet and confer fully without a PMK deposition notice in hand.  Plaintiff contends that much of the PMK deposition notice will be taken verbatim from the parties' June 18, 2010 joint case management statement.  Without knowing all the topics Plaintiff wishes to cover with the PMK, however, Defendant cannot identify an appropriate witness.  Without being able to identify a witness, Defendant cannot set a date certain for a PMK deposition.   Since January 2010, Defendant has repeatedly advised Plaintiff of this fact.  Defendant requests that Plaintiff provide a PMK deposition notice by November 11, 2010 so Defendant may identify a proper witness and available deposition dates.

Defendant also requests that formal notices of deposition issue for the deponents who remain in Defendant's employ after a meet and confer to determine availability during the holiday season.

Plaintiff responds as follows.  Without having notices in hand prior counsel John Cowden was able to provide, and commit to, the weeks of November 1st for the PMK depo and December 13th for the percipient witnesses; due to Cowden's departure, the dates he committed to have been

scrapped.  There is no reason current counsel cannot provide dates a month or so from now, particularly as plaintiff's counsel has repeatedly advised that the Court of Appeal in *Fotheringham v. Avery Dennison Corporation*, now pending in the Second District Court of Appeal, B217757, requires counsel to provide dates he is unavailable *now* so that the Court may schedule oral argument around counsel's unavailability.

3.      Plaintiff's FRCP Rule 36 requests for admissions.

On July 2nd plaintiff propounded three requests for admission:

1.      Customer Engineers have no minimum requirement on how many customer worksites they must visit each day.

2.      There is no way to determine how long each service call will take.

3.      The number of customer worksites each customer engineer will visit varies from day to to day.

On August 2nd defendant responded as follows:

REQUEST FOR ADMISSION NO. 1:
        Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is vague and ambiguous as to the meaning of "minimum requirements."  Given the ambiguity in this request, defendant is unable to admit or deny it.

RESPONSE TO REQUEST FOR ADMISSION NO. 2:
        Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent permission from the arbitrator.  Defendant will reconsider this objection upon this Court's ruling on its Motion to Compel Arbitration, which is expected shortly. Defendant further objects to this request on the grounds it is vague and ambiguous as to the meaning of "service call."  Given the ambiguity in this request, defendant is unable to admit or deny it.

RESPONSE TO REQUEST FOR ADMISSION NO. 3:

        Defendant objects to this request on the grounds it is premature because defendant's Motion to Compel Arbitration is pending.  Defendant's arbitration policy does not allow the parties to propound written discovery requests, absent

66

permission from the arbitrator.  Defendant will reconsider this objection upon this
Court's ruling on its Motion to Compel Arbitration, which is expected shortly.
Defendant further objects to this request on the grounds it is vague and ambiguous
as to the meaning of "customer worksites."  Given the ambiguity in this request,
defendant is unable to admit or deny it.

Plaintiff contends that at the October 7th meeting of counsel defendant agreed to either
admit or deny, rather than claim an inability to do one or the other.  There is no basis to refuse to
take a position one way or the other.

Defendant NCR will provide substantive responses to Plaintiff's Requests for Admission
by December 6, 2010.

Plaintiff responds as follows.  This is yet another indication of why NCR should be
sanctioned for interposing specious objections and responses.  There is nothing prolix or arcane
about the requests as phrased, and there was no reason for NCR to fail to admit or deny initially.

4.      <u>Plaintiff's request that he be allowed to take more than ten depositions.</u>

FRCP Rule 30(a)(2)(A)(i) allows plaintiff ten depositions of seven hours each (Rule
30(d)(1)), but plaintiff will not require a full seven hours for each deponent.  Plaintiff estimates
that most of the depositions will last approximately two to three hours, though some will be
longer, and some possibly shorter.

Plaintiff proposes that he be allowed to take depositions as long as he consumes no more
than seventy hours in direct examination of the deponents.  This request is reasonable in light of
the facts of this case.

Plaintiff's first amended complaint alleges NCR embarked upon a cost-cutting program
in 2007 (p.6, ¶22) which was expanded by NCR's HR Director in March of 2008 (p.6, ¶25) and
motivated by the desire to get rid of higher earning, older CEs such as plaintiff (p.8,  ¶35) and
NCR's realization that it would have to pay plaintiff a significant amount (ultimately nearly three
times the average amount) in settlement of his claim as a class member in *Teeter v. NCR*, Case
No. ED CV 08-00297-SGL(JCRx) (pp. 10-11,  ¶¶51-54).

Plaintiff's initial disclosure of documents resulted in plaintiff producing approximately
400 documents, mainly emails plaintiff received from NCR's management.  Based upon those
emails, and those produced by defendant as part of its initial disclosure, plaintiff has determined
he needs to depose the following individuals:  Chris Wallace, Chris Cheadle, Joe Hoyle, Vicki
Rennick, Dave Henderson, Bill Nuti, Jeff Kiss, Tom Alvey, Steve Battleson, Hannibal Morales,
Don Pursell, John Foote, John Harvey, Bruce Schagunn, Brenda Michalek, Erick Aguilar.  Most
are located at NCR's corporate office.

Most depositions will be taken where NCR's headquarters is located, Duluth, GA, just
outside Atlanta.  Plaintiff is willing to depose the witnesses at NCR's offices, sparing the

employees the need to travel anywhere and therefor minimizing inconvenience and the disruption of NCR's ongoing operations.

NCR's payroll records reflect that plaintiff earned over $60,000 per year for several years prior to his firing in 2008. Plaintiff has been out of work for over two years since being fired in September of 2008, and has incurred a loss of earnings alone of over $100,000.

Given the allegations in this case and the amount in controversy, consistent with FRCP Rule 26(b) the Court should allow plaintiff to take more than ten depositions, as long as plaintiff does not exceed seventy hours in direct examination of the witnesses.

Defendant NCR's position regarding this issue is as follows: Plaintiff's counsel has requested sixteen separate depositions in several different states. Many of the deponents are no longer employed by Defendant and are located outside the state of California. A summary of the proposed deponents and their status is as follows:

| | | |
|---|---|---|
| Chris Wallace: | No longer employed. | Former Sr. VP NCR Services. |
| Chris Cheadle: | No longer employed. | Former Services APAC VP. |
| Joe Hoyle: | No longer employed. | Former HR VP. |
| Vicki Rennick: | Still employed. | HR Director, Duluth, GA. |
| Dave Henderson | No longer employed. | Former CSS VP. |
| Bill Nuti: | Still employed. | CEO, New York. |
| Jeff Kiss: | No longer employed. | Former HR Consultant II. |
| Tom Alvey: | No longer employed. | Former VP Customer Care. |
| Steve Battleson: | Still employed. | Customer Service General Manager Peachtree, GA. |
| Hannibal Morales: | Still employed. | Technical Support Specialist, CA. |
| Don Pursell: | No longer employed. | Former Executive Services Mgr. |
| John Foote: | Still employed. | Executive Services Manager, WA. |
| John Harvey: | Still employed. | Field Service Manager, NY |
| Bruce Schagunn: | No longer employed. | Former Field Service Mgr II, |

Brenda Michalek:      No longer employed.      Former HR Manager II.

Erick Aguilar:        No longer employed.      Former Field Service Mgr. II.

Mr. Bill Nuti is the current CEO of the company and Defendant anticipates that this "apex" deponent is mentioned only for the purpose of harassment and that his testimony would not be truly relevant to the issues in this case.  Should Plaintiff wish to pursue policy setting or document authenticity, there are alternative methods of obtaining this legitimate discovery which are less intrusive and disruptive.

     Plaintiff responds as follows.  NCR offers no reason why plaintiff's proposal, i.e., the ten depo rule be modified so that plaintiff may take 70 hours of direct examination rather than be limited to only ten depositions, should not be granted.

     This case involves ferreting out from reluctant witnesses the truth concerning what were the motivations for the "directive" by NCR management to push for terminating employees (tab T) and why there was so much "pressure" to do so (tab FF).

     From NCR's own tally, only the older employees in plaintiff's workgroup were fired between June 2008 and April of 2009 (tab NN) even though as of April 30, 2008 there were several younger CEs whose SLAs were "in the red", i.e., poor (tab II).

Dated:                JOHN ELSON for plaintiff Terry Doubt


                      _____



Dated:                PATRICK C. MULLIN for defendant NCR


                      _____




JE: hs

4850-3422-9768, v.  1

**INDEX OF EXHIBITS IN SUPPORT OF PLAINTIFF'S CONTENTIONS
AS TO WHAT THE  EVIDENCE ALREADY IN HAND SHOWS**

| TAB | DATE | AUTHOR | DESCRIPTION |
|---|---|---|---|
| A | 02/12/01 | Fear | email re:  Unauthorize OT for Sunday 02-11-2001 |
| B | 07/06/01 | Henderson | email re_cost efficiency of older CEs |
| C | undated (2001?) | Morales, Pursell | evaluation by NCR 2000_Doubt |
| D | 03/05/01 | Gagliardi | 2000 employee incentive plan award |
| E | undated (2002?) | Morales, Pursell | evaluation by NCR 2001_Doubt |
| F | 03/03/02 | Gagliardi | 2001 Business Performance Plan bonus calculation |
| G | undated (2003?) | Morales, Pursell | evaluation by NCR 2002_Doubt |
| H | 10/13/05 | Harvey | email re_OT approval needed |
| I | 10/29/05 | Niehoff |  posting re_NCR culture |
| J | 02/26/07 | Compensation | email re:  Confidential - 2006 Business Performance Plan (BPP) Bonus |
| K | 03/27/07 | Aguilar, Foote | Evaluation by NCR 2006 of plaintiff Doubt |
| L | 09/25/07 | NCR | PIP write-up of Doubt |
| M | 10/27/07 | NCR | PIP write-up of Doubt |
| N | 11/13/07 | Cheadle | email re:  Importance of Data Integrity in our business |
| O | 01-14-08 - 01-20-08 | Aguilar | schedule spreadsheet |

| P | 01/21/08 | Cheadle | Very Imporant Message Regarding Americas CS Organization Changes |
|---|---|---|---|
| Q | 02/26/08 | Aguilar | email and its attachment, 02-26-08 750B Roster |
| R | 03/07/08 | Compensation | email - 2007 Business Performance Plan (BPP) Bonus |
| S | 03/14/08 | NCR | pay period end 03-09-08 ck dtl |
| T | 03/24/08 | Michalek | email to Foote re_Hoyle directive re_2007 PIPs; list1, list2. |
| U | 03-26-08 - 03-28-08 | Foote_Michalek_ Schagunn_Harvey | email string re_salary expense & PIP plan |
| V | 04/01/08 | NCR | PIP write-up re Doubt |
| W | 04/01/08 | NCR | PIP write-up re Knapp |
| X | 04/02/08 | Aguilar | email re_giving PIPs to Doubt & Knapp |
| Y | 4-07-08 - 4-13-08 | Aguilar | schedule spreadsheet |
| Z | 04-14-08 - 04-20-08 | Aguilar | schedule spreadsheet |
| AA | 04/17/08 | Aguilar | email Critical accounts. |
| BB | 04/17/08 | Michalek | email re_Knapp voicemail&weekly sessions |
| CC | 04/28/08 | Rennick_Michalek_ Schagunn | email string re firing Doubt 6-4 |
| DD | 04-21-08 - 4-27-08 | Aguilar | schedule spreadsheet |
| EE | 04/30/08 | Aguilar, Foote | evaluation by NCR of Doubt |
| FF | 05/01/08 | Harvey_Michalek_Foote | email string re_'pressure' |

| GG | 05-12-08 - 05-13-08 | Schagunn_Foote_ Battleson_Foote_ Schagunn_Aguilar | email string re_exit dates |
|----|----|----|----|
| HH | 05/29/08 | Aguilar | email SLAs YTD results through 4/30/08 |
| II | 05/29/08 | NCR | YTD as of 04-30-08 CE_750B spreadsheet |
| JJ | 08/20/08 | Aguilar | email "You've Got Points!" |
| KK | 08-25-08 to 8-31-08 | Aguilar | schedule spreadsheet |
| LL | 09/05/08 | Aguilar | email re:  August Territory Summary, and 09/05/08 August Territory Summary spreadsheet |
| MM | 09/10/08 | Aguilar | email forwarding email FW Important NW Overtime Approval Process effective immediately, that had been sent by John Harvey, then Field Operations Director for the Northwest Region |
| NN | undated | NCR | list of firings in plaintiff's workgroup 06-27-08 - 04-17-09 as per NCR |